

FILED & JUDGMENT ENTERED

Christine F. Winchester

January 5 2026

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

*Ashley A Edwards*
_____
Ashley Austin Edwards
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

In re:

**Ryan Lashon Ford,**

Debtor.

Case No. 24-31129
Chapter 7

**Melanie D. Johnson Raubach**, solely in her capacity as Chapter 7 bankruptcy trustee for the Estate of Ryan Lashon Ford,

Plaintiff,

**Holt Solutions, LLC**,

Defendant,

Adv. Pro. No. 25-03032

**ORDER AND OPINION TERMINATING THE DEBTOR'S CIVIL CONTEMPT, DIRECTING THE DEBTOR TO PAY ACCRUED FINES, REDUCING SANCTIONS TO JUDGEMENT, DENYING THE DEBTOR'S MOTIONS, PERMANENTLY DENYING DISCHARGE, BARRING THE DEBTOR FROM FILING IN THE BASE CASE ON MATTERS UNRELATED TO THE ADVERSARIAL PROCEEDING, DENYING THE BANKRUPTCY ADMINISTRATOR'S REQUEST FOR 9011 SANCTIONS, AND REPORTING CRIMES TO THE WESTERN DISTRICT OF NORTH CAROLINA U.S. ATTORNEY AND THE MECKLENBURG COUNTY DISTRICT ATTORNEY**

**THIS MATTER** is before the Court upon the Debtor's *Response and Declaration to Order Denying Debtor's Request to Purge Contempt, Further Sanctioning Debtor, and Denying Debtor's Discharge* [Doc. No.[1] 224; Adv. Proc. Doc. No. 57], filed on October 6, 2025 (the "First Contempt Review Motion"), *Motion to Vacate or Stay Civil Contempt Proceedings, for Protective Relief, and Supporting Memorandum of Law Under Fed. R. Bankr. P. 9020 and Due Process Principles* [Do. No. 242], filed on October 27, 2025, (the "Second Contempt Review Motion")*, Motion to Vacate Contempt Order and For Declaratory Relief that the Court Exceeded Its Article I Authority* [Doc. No. 248], filed on October 30, 2025, (the "Third Contempt Review Motion"), *Motion to Vacate or Deny Contempt and Sanctions for Lack of Evidence Basis and Violation of Federal Rules of Evidence and Due Process* [Doc. No. 252], filed on October 30, 2025 (the "Fourth Contempt Review Motion"), *Motion for Reconsideration, Protective Relief, and Stay Pending Appeal* [Doc. No. 293], filed on November 12, 2025 (the "Fifth Contempt Review Motion"), and *Motion to Reconsideration, Protective Relief, and Emergency Stay Pending Appeal* [Doc. No. 295], filed on November 12, 2025 (the "Sixth Contempt Review Motion," and together with the First Contempt Review Motion, the Second Contempt Review Motion, the Third Contempt Review Motion, the Fourth Contempt Review Motion, the Fifth Contempt Review Motion, the "Contempt Review Motions"), all relating to the Court's *Order Finding Debtor in Civil Contempt* [Doc. No. 132; Adv. Proc. Doc. No. 34], entered July 14, 2025 (the "Contempt Finding Order"), *Opinion and Order Sanctioning Debtor for Failure to Comply with Omnibus Order and Contempt Order* [Doc. No. 147; Adv. Proc. Doc. No. 39], entered July 29, 2025 (the "Contempt Sanctions Order"), *Order*

---

[1] "Doc. No." refers to the docket numbers in the above captioned Chapter 7 base case (the "Chapter 7 Base Case"), unless the phrase follows either (1) "Adv. Proc.," where it refers to the above captioned Adversary Proceeding stemming from the Base Case (the "Adversary Proceeding"), or (2) "Dist. Ct.," where it refers to the Debtor's District Court case concerning the Debtor's Reference Withdrawal Motion, as defined below.

*Denying Debtor's Request to Purge Contempt, Further Sanctioning Debtor, and Denying Debtor's Discharge* [Doc. No. 223; Adv. Proc. Doc. No. 56], entered October 7, 2025 (the "<u>Contempt Further Sanctions and Discharge Order</u>"), and *Order Continuing For Final Hearing* [Doc. No. 270], entered on November 4, 2025 (the "<u>Final Contempt Order</u>," and together with the Contempt Finding Order, the Contempt Sanctions Order, the Contempt Further Sanctions and Discharge Order, the "<u>Contempt Orders</u>"), as well as before the Court upon the Debtor's *Motion for Reconsideration of Order Denying Motion to Shorten Notice and Asserting Procedural Disadvantage and Prejudice* [Doc. No. 264], filed on November 3, 2025 (the "<u>Notice Reconsideration Motion</u>," and together with the Contempt Review Motions, the "<u>Debtor's Outstanding Motions</u>"), and related to the Court's *Order Denying Motion to Shorten Notice* [Doc. No. 258], entered on October 31, 2025 (the "<u>Denying Shortened Notice Order</u>").

For the reasons outlined below, (1) terminates the Debtor's civil contempt, (2) orders the Debtor to pay the fines she has accrued under the Contempt Orders, (3) reports to the U.S. Attorney for the Western District of North Carolina and the Mecklenburg County District Attorney various crimes, (4) denies the Debtor's Outstanding Motions, (5) denies the Debtor's discharge, (6) bars the Debtor from docketing any filings in her Chapter 7 Base Case without prior approval by the Court, and (7) denies the request for Federal Rule of Bankruptcy Procedure 9011 sanctions against the Debtor.

## I.    FACTUAL AND PROCEDURAL HISTORY[2]

### A.  Introduction

1.        On December 23, 2024 (the "Petition Date"), the Debtor filed her *pro se*, *Voluntary Petition* [Doc. No. 1] (the "Debtor's Petition"), for relief under Chapter 7 of Title 11 of the United States Code. The Petition Date would begin what will probably be one of the most involved individual Chapter 7 cases the Court will have.

### B.  Pre-Petition and Petition Date Facts

#### 1.  The Debtor's Assets

2.        As recently as 2023, the Debtor owned two properties: (1) a property at 3819 Yorkford Dr, Charlotte, North Carolina, 28269 (the "Yorkford Property"), and (2) a property at 6415 Nevin Glen Drive, Charlotte, North Carolina, 28269 (the "Nevin Property," and together with the Yorkford Property, the "Properties").[3] As of the Petition Date, the Debtor received almost $1,800 in income from renting the Nevin Property (the "Rental Income").[4]

3.        The Debtor formed Holt Solutions, LLC, a North Carolina limited liability company ("Holt Solutions") on April 20, 2022 (the "Holt Solutions Creation Date").[5] Holt

---

[2] The Trustee and Bankruptcy Administrator managed to condense and organize for the Court over three hundred docket entries, countless pleadings, nine hearings spanning eight months and almost 15 hours combined, *see infra* notes 44, 55, 76, 88, 105, 124, 149, 184, 224, & 265, and organize it by into approximately twenty pleadings. The Court greatly appreciates thus extensive and outstanding work.

[3] *Cf. Yorkford Property & Nevin Property Quitclaim Deeds Instrument No.s. 2023036479 & 2023036480*, attached to *Seventh Status Report on Debtor's Compliance with Orders* [Doc. No. 278; Adv. Proc. Doc. No. 72] (the "Seventh Status Report"), as Exhibit A, pp. 15–21 (the "Properties Conveyances Quitclaim Deeds").

[4] *See Debtor's June 2025 Residential Rental Contract Renewal and/or Amendment*, attached to Seventh Status Report, as Exhibit B, pp. 22–23; *Debtor's 2024 IRS Form 1040 Schedule E (Supplemental Income and Loss)*, attached to *Declaration of Melanie D. Johnson Raubach* [Doc. No. 275], as Exhibit A, pp. 2–4 (reporting receipt of rental income totaling $1,795 monthly or $19,740 annually).

[5] *See Holt Solutions' 2022 North Carolina Secretary of State Limited Liability Company Articles of Organization*, attached to Ex Parte *Motion for Production of Documents Only from the Debtor and Holt Solutions, LLC, Pursuant to Bankruptcy Rule 2004* [Doc. No. 92] (the "Holt Solutions Document

Solutions' sole registered member, organizer, and agent is the Debtor, and its mailing and principal and registered office addresses is the same as the Yorkford Property's address,[6] which she described in official records as a tribal property.[7] The Debtor also so operates, as of the Petition Date, Holts Consulting, another North Carolina limited liability company ("Holts Consulting").[8] A year and a day after the Holt Solutions Creation Date and around 19 months prior to the Petition Date, the Debtor conveyed to Holt Solutions first the Yorkford Property (the "Yorkford Property Conveyance")[9] and then the Nevin Property (the "Nevin Property Conveyance," and together with the Yorkford Property Conveyance, the "Conveyances"),[10] on April 23, 2023 (the "Conveyances Date").[11]

4.    On the Petition Date, the Debtor held almost $9,200 in bank accounts (the "Debtor's Held Funds").[12] Additionally, twenty-six bank accounts existed on the Petition Date which belonged to the Debtor either wholly individually, jointly with her dependents, or through Holt Solutions (the "Debtor's Accounts").[13] The month prior to the Petition Date, the Debtor was actively using four of the Debtor's Accounts, which were also the four accounts which held the most funds as of the Petition Date; from three of those four accounts the Debtor transferred funds five times on the Petition Date itself.[14]

---

Production Motion"), as Ex. A, pp. 6–8 (the "Holt Solutions State Registration Filing") (providing the Debtor's filing with the North Carolina Secretary of State the articles of organization forming Holt Solutions, LLC, describing it as a "Tribal LLC [that] function[s] as a multi-purpose Aboriginal Tribal Association Trust").

[6] *See id.*
[7] *See id.*
[8] *See* Debtor's Petition, p. 2.
[9] *See* Properties Conveyances Quitclaim Deeds, pp. 16–18.
[10] *See id.*, pp. 19–21.
[11] *See id.*
[12] *See* Seventh Status Report, ¶ 22.
[13] *See id.*
[14] *See id.*, ¶ 23.

### 2.  The Tribal Entities and the Tribal Courses

5.      The Debtor is and has been a member of the Xi-Amaru Tribe (the "Tribe") since at

least 2022, according to the Debtor's admission to the Court. The Tribe appears to one entity within

a larger amorphous group of related entities or individuals, including, in addition to the Tribe, the

Aboriginal Republic of North America ("ARNA"), HAWAB DFW Region 6, Shabazz Associates,

the Aboriginal Medical Association, the Aboriginal University, a 'Minister' Kojo Xi Shabazz, also

known as Aboriginal Don ("Minister Kojo"), and a 'Dr.' Amaru Nama Taga Xi-Ali, also known as

'Dr.' Ali Muhammad ("Dr. Ali") (collectively and together with the Tribe, the "Tribal Entities").

6.      The Tribal Entities offer various educational courses (the "Tribal Courses"), some

of which are labeled 'Jurist' and appear to purport to teach about the law (the "Jurist Courses").[15]

The Debtor has taken various courses with the Tribe (the "Debtor's Tribal Courses") and began,

around the Petition Date, one of the Jurist Courses (the "Debtor's Jurist Course"), per her

submissions. Within three years prior to the Petition Date, the Debtor made nearly $4,000 in

payments to various Tribal Entities (the "Tribal Payments").[16]

### 3.  The Petition and the IFP Application

7.      In the Debtor's Petition, the Debtor made selective and false submissions, as well

as material omissions, regarding her financial matters. As to the Debtor's assets, although the

Debtor's Petition did disclose (1) the Debtor's interest in the Debtor's vehicle,[17] (2) the Debtor's

interest in Holts Consulting and the latter's existence since April 7, 2022,[18] and (3) an interest in

---

[15] *See infra* ¶¶ 107–110.
[16] *See infra* note 190 and accompanying text.
[17] *See* Debtor's Petition, p. 11.
[18] *See* Debtor's Petition, p. 2 & 58.

the Properties with an asserted valuations for the Properties,[19] the Petition omitted any reference

(1) to creditors of the Properties or the vehicle (the "Debtor's Creditors"),[20] as well as (2) to Holt

Solutions or the Debtor's interest in Holt Solutions.[21] The Petition also denied generally the

Conveyances' occurrence.[22] Lastly, the Debtor's Petition claimed a "homestead exemption" and

various exemptions pursuant to laws concerning foreign or federally recognized Native individuals

(the "Debtor's Tribal Exemptions") for the Debtor's assets generally.[23]

8.      As to the Debtor's income, the Debtor's Petition asserted that the Debtor's income

was around $3,000 monthly (the "Debtor's Asserted Income") for herself and for her three

dependents, which omitted the Rental Income.[24] Furthermore, the Debtor's Petition also explicitly

denied the Rental Income's existence, both specifically as of the Petition Date[25] and generally

within two years of the Petition Date.[26] The Debtor's Petition also denied specifically the Debtor's

Held Funds' existence and omitted any reference to any of the Debtor's Accounts.[27]

---

[19] *See* Debtor's Petition, p. 11 (providing a valuation for the Properties as $30,000 each

[20] *See* Debtor's Petition, pp. 23–25.

[21] *See* Debtor's Petition, p. 2 & 58.

[22] *See* Debtor's Petition, p. 55 (the Debtor's response "No" to whether, "[w]ithin 2 years before [she] filed for bankruptcy, [she had] s[old], trade[d], or otherwise transfer[red] any property to anyone, other than property transferred in the ordinary course of [her] business or financial affairs").

[23] *See* Debtor's Petition, Schedule C: The Property You Claim as Exempt, pp. 21–22.

[24] *See* Debtor's Petition, pp. 42–43 (the Debtor's responses regarding her income providing only three sources of income, specifically, $800 a month in family support, just under $500 a month in government assistance, and just under $1,900 a month pension or retirement income).

[25] *See* Debtor's Petition, pp. 42–43 (the Debtor's response to Question #8a reporting "$0.00" for "[n]et income from rental property").

[26] *See* Debtor's Petition, p. 49 (the Debtor's negative answers to Question 4, querying whether she had received "any income from employment or from operating a business during this year or the two previous calendar years," and Question 5, querying whether she had "receive[d] any other income during this year or the two previous calendar years").

[27] *See* Debtor's Petition, p. 15 (the Debtor's negative answers to both Questions #16 and 17 as to whether the Debtor "own[s] or ha[s] any legal or equitable interest in" "cash," described as "[m]oney you have in your wallet, in your home, in a safe deposit box, and on hand when you filed your petition," or "[d]eposits of money," described as "[c]hecking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions").

9.      Along with her Petition, the Debtor also filed the *Application to Proceed* In Forma Pauperis [Doc. No. 4] (the "IFP Application"), requesting that the Court waive the Debtor's Chapter 7 filing fee due to the Debtor's income being below the threshold, 150% of the poverty line for the debtor's household. For this calculation, the IFP Application provided similar numbers to those provided in her Petition, also omitting the Rental Income.[28] The IFP Application did disclose one of the Debtor's Accounts with a balance of $0.00 but affirmed that that amount encompassed the Debtor's Held Funds.[29] The Court granted the IFP Application.[30]

## C. January through May Facts

### 1. The January 341 Meeting, Early Filings, and the April 23 Hearing

10.      On January 22, 2025, the Trustee held a 341 Meeting of Creditors (the "January 341 Meeting").[31] By then, the Trustee had learned of Holt Solutions and the Conveyances through independent research, since the Debtor's Petitions' had omitted both matters.[32] At the January 341 Meeting, the Debtor made additional similar false submissions regarding the truth of the Debtor's Petition (1) generally[33] and as the Debtor's Petition pertained (2) to the Debtor's assets[34] and (3)

---

[28] *See* IFP Application, p. 1.

[29] *See* IFP Application, p. 2.

[30] *See Order Granting Application to Proceed* In Forma Pauperis [Doc. No. 7].

[31] *See First Meeting of Creditors with 341(a) meeting to be held on 1/22/2025 at 10:00 AM at Zoom 341 Meeting* [Doc. No. 5]; *see also Transcript of 341 Meeting of Creditors on January 22, 2025, attached to Notice of Filing of Transcript of 341 Meeting of Creditors Held on January 22, 2025* [Doc. No. 273], pp. 2–27 (the "January 341 Meeting Transcript").

[32] *See* January 341 Meeting Transcript, at 9:8–9:12 (the Trustee statement how she had learned through North Carolina state records about the Debtor's interest in Holt Solutions); *id.*, at 11:23–12:10 (same about the Yorkford Property Conveyance); *id.* 15:14–15:24 (same about the Nevin Property Conveyance).

[33] *See id.*, at 3:22–4:11 (the Trustee's and the Debtor's exchange where the Debtor affirms that the Debtor's Petition was, "[t]o the best of [her] knowledge, correct," that there were "not, that [she was] aware of" or "any changes [she] need[ed] to announce," that she "list[ed] all of [her] assets," that she "list[ed] all of [her] debt").

[34] *See id.*, at 4:3–4:6 (the Trustee's and the Debtor's exchange where the Debtor responds "[y]es" as to whether the Debtor's Petition had identified all her assets).

the Conveyances,[35] as well as regarding (4) the Tribal Payments.[36] The Debtor also described Holt

Solutions and Holt Consulting as operating on behalf of the Tribe to which they also owed any

income received.[37] She described Holt Solutions as managing the Properties for the Tribe[38] and

asserted that the Tribe "controls" and is responsible for the Properties[39] on account of the

Conveyances because the Tribe "owns" Holt Solutions as "tribal property" or a "tribal business."[40]

11.     The same day as the January 341 Meeting, the Trustee filed a *Notice of Possible*

*Dividends and Request for Notice to Creditors* [text-only docket entry]. On March 3, 2025, the

Debtor filed the *Pro Se Reaffirmation Agreement Between Debtor and Navy Federal Limited* [Doc.

No. 19] (the "Reaffirmation Agreement"). The Reaffirmation Agreement provided the Debtor's

Asserted Income for the Debtor's income, excluding the Rental Income.[41] On March 20, 2025, the

---

[35] *See id.*, at 4:8–4:11 (the Trustee's and the Debtor's exchange where the Debtor responds "[n]o" as to whether the Debtor had "sold or given away anything in the last four years that [the Debtor] did not include in" the Debtor's Petition).

[36] *See id.*, at 17:4–17:10 (the Trustee's and the Debtor's exchange where the Debtor responds "[n]o" as to (1) whether the Debtor "pay[s] funds to the Tribe," and again as to (2) whether the Debtor "ha[s] [ ] ever made a monetary transfer to the Tribe").

[37] *See id.*, at 19:19–20:8 (the Debtor's response, when asked what Holt Solutions and Holt Consulting does, describing their work as "services of charity" "through the Tribe. . . [,] services of learning more about your Tribal identity. . . .[,] [L]earning about your lineage, of your Indigenous lineage really").

[38] *See id.*, at 22:20–23:8 (the Debtor's response, when asked whether Holt Solutions "ha[s] any income," asserting that "[i]t's the Tribal property and Tribal business" and denying that "as a Tribal business[,] [ ] it sell[s] any goods. . . .[,] [A]ny products. . . .[,] [Or] any services," and, when asked whether the Tribe "manage[s] property," asserting "[i]t holds the property").

[39] *See id.*, at 11:23–12:20 (the Debtor's response, when asked about the Conveyances as to the Yorkford Property, asserting (1) that "[t]he transfer was done over to the Tribe," (2) that she had "owned the property and [ ] put it over to the Tribe's name," that she "receive[d] in exchange" "[n]othing," and (3) that "[t]he Tribe" "controls the property"); *id.*, at 16:3–16:7 & 16:16–17:3 (the Debtor's response, when asked about the Conveyances as to the Nevin Property, asserting (1) that she did not "receive anything in exchange," (2) that "[t]he Tribe" "controls that property," and (3) that "[t]he Tribe" "is responsible for paying upkeep on that property" such as "if [ ] it needed a new roof" as well as paying its "utilities [and] taxes" with income, that the Debtor surmised, from "other members and the Tribal business").

[40] *See id.*, at 9:13–9:21 & 9:25–11:8 (the Debtor's response, when asked about Holt Solutions, stating that it was a "Tribal property" or "Tribal business . . . . [I]n which the Tribe in which I'm a part of owns," and description of the Tribe as "actually the Xi-Amaru Tribal Government" that is "like the Native American").

[41] *See* Reaffirmation Agreement, p. 1. Because the Debtor's Asserted Income minus the Debtor's expenses did not provide enough surplus to pay the reaffirmed debt payments under the Reaffirmation Agreement, *see id.*, the Reaffirmation Agreement was deemed a presumptive hardship and set for hearing on April 7, 2025 (the "April 7 Hearing"). *See Court Notice of Reaffirmation Hearing* [Doc. No. 21].

Trustee filed the *Objection to Exemptions* [Doc. No. 20] (the "Exemptions Objection"), objecting

to the Debtor's Tribal Exemptions as lacking basis in law.[42]

12.    Over the following month, the Debtor would move twice to end the Chapter 7 Base

Case. First, on April 3, 2025, the Debtor filed the *Motion to Voluntary Dismiss Case* [Doc. No. 26]

(the "Dismissal Motion"), asserting that the Chapter 7 Base Case was filed under the mistaken

impression bankruptcy was necessary to deal with her debts, but had concluded that negotiating

with her creditors outside of bankruptcy would better ensure she retains her assets.[43] On April 22,

2025, the Debtor filed the *Notice of Motion and Motion to Convert Chapter 7 Case to Chapter 11*

*Pursuant to 11 U.S.C. 706(a)* [Doc. No. 41] (the "First Chapter 11 Conversion Motion").

13.    On April 23, 2025, the Court held a hearing in this case (the "April 23 Hearing")[44]

on, *inter alia*, the Reaffirmation Agreement, Exemptions Objection, the Dismissal Motion. The

---

[42] *See* Exemptions Objection, pp. 2–3 (requesting the Court denies the claimed exemptions on the grounds that, because "North Carolina has opted out of the Federal exemptions provided," " 'the State's exemption statute applies to resident debtors in bankruptcy'," whereas the Asserted Exemptions were "not [under] the North Carolina exemption statutes" (citation omitted)).

[43] *See generally* Dismissal Motion.

[44] *See Transcript for Hearing/Trial held on 4/23/2025* [Doc. No. 180] (the "April 23 Hearing Transcript"); *see also Courtroom Recording on April 23, 2025, at 10:29:12 AM* [Doc. No. 43] (56 minutes). Technically, the April 23 Hearing was the third hearing in this case. However, the first hearing technically held, the April 7 Hearing, had its matters continued to the next hearing on April 21, 2025, *see Courtroom Recording on April 7, 2025, at 09:50:58 AM* [Doc. No. 30] (noting the Reaffirmation Agreement had been continued for hearing on April 21, 2025), as did in turn the next hearing to April 23 Hearing. *See Courtroom Recording on April 21, 2025, at 09:43:33 AM* [Doc. No. 40] (noting both the Reaffirmation Agreement and Exemptions Objection had been continued for hearing on April 23, 2025); *see also Notice and Motion for Request of Court Hearing and Request for Alternative Hearing Dates* [Doc. No. 32]; *Order Regarding Electronic Device Motion and Hearing Date Motion* [Doc. No. 37].

Originally, Debtor had set the First Chapter 11 Conversion Motion for hearing at the April 23 Hearing. *See* First Chapter 11 Conversion Motion, p. 4. The same day, the Trustee filed the *Response Objection of Trustee to Notice of Hearing on Debtor's Notice of Motion and Motion to Convert Chapter 7 Case to Chapter 11 Pursuant to 11 U.S.C. Sec. 706(a)* [Doc. No. 42], asserting the time period for hearing the First Chapter 11 Conversion Motion was not long enough and that it did not warrant emergency consideration. The Court explained to the Debtor at the top of the April 23 Hearing that the Court could not hear the First Chapter 11 Conversion Motion because the period from when it was filed to when the Debtor sought to have it heard (the "notice period") contravened Fed. R. Bankr. P. 2002(a)(4)'s requirement of a 21-day notice period for such motions. *See* April 23 Hearing Transcript, at 3:21–4:9. The Court also noted that although the full required period generally was required, it could sometimes be reduced, but never for a period as short the Debtor sought. *See id.*, at 4:10–4:16 (the Court's informing the Debtor that, "to the extent

Debtor, the Trustee and the United States Bankruptcy Administrator for the Western District of

North Carolina (the "Bankruptcy Administrator," and together with the Debtor and the Trustee, the

"Parties") appeared at the April 23 Hearing. The Court first heard the Reaffirmation Agreement at

the April 23 Hearing, which the Court ultimately granted.[45]

14.    During consideration of the Exemptions Objection, the Debtor clarified the

assertions she made at the January 341 Meeting regarding Holt Solutions, the Properties, and the

Properties Conveyances vis-à-vis the Tribe. Specifically, the Debtor asserted that she stilled wholly

owned the Properties,[46] notwithstanding the Conveyances, because such conveyances to tribal

entities were allowed and was common practice "for asset protection" by tribal individuals.[47]

---

that something is on shortened notice, occasionally the Court will consider shortened notice," but "[n]ever
really 24 hours' notice," and only "[l]ike maybe [to] truncate from the 14 days or the 21 days if there's an
emergency, but that's then paired with a motion to shorten notice").

[45] *See* April 23 Hearing Transcript, at 5:10–9:10. During discussion of the Reaffirmation Agreement, the
Debtor appears to have avoided making a further false submission to the Court at the April 23 Hearing as
to the Debtor's Asserted Income representing correctly the Debtor's income. *See id.*, at 7:06–7:21 (the
Court's and the Debtor's exchange:

> Court: [L]ooking at what you included on the reaffirmation agreement, it looks like for this that you
> might have income of $3,135 a month; is that correct?
> Debtor: (No response)
> Court: On that front page of the reaffirmation agreement.
> Debtor: Yes.
> Court: And we saw elsewhere in Schedule I that you may not be employed. I'm confused on that.
> Debtor: I — I am on disability pension, yes.
> Court: Okay. Understood.
> Debtor: I'm retired.
> Court: All right. So, you receive 3,000 monthly. Excellent. Okay. And then it looks like your expenses
> are about $4,098.03 a month; is that correct?
> Debtor: Yes.).

[46] *See id.*, at 16:18–16:22 (the Debtor's clarification of her statements made at the January 341 Meeting
asserting that she was "still under control of" Holt Solutions); *id.*, at 17:2–17:5 (same that her claimed
exemption meant that "even though once again the property is in the tribal entity, [she was] the sole owner
of it" especially since she "use[s] the property, of course, as [her] personal residence"); *id.*, at 18:24–19:2
(same "even though [she] transferred it under the tribal entity, which is a part of the [Tribe's] government,
it is wholly sold—owned and controlled by [herself] as the tribal member").

[47] *See id.*, at 16:22–17:1 (the Debtor's statement that she "kn[ew]. . . that it's a normal practice to transfer
any assets or anything to [a person's] tribal entity just for cultural purposes and for [them] to be under—in
good standing with any legal responsibilities that [they] also have under tribal law"); *id.*, at 17:12–17:15
(the Debtor's statement that that the Properties Conveyances "w[ere] done as a tribal practice that we always

During consideration of the Dismissal Motion, the Trustee and Bankruptcy Administrator questioned the likelihood of and the Debtor's ability to pay her creditors outside of bankruptcy. The Debtor countered that her enrollment in the Debtor's Tribal Courses would engender the necessary funds to pay the Debtor's creditors.[48] The Court ultimately granted the Exemptions Objection[49] and denied the Dismissal Motion.[50] The Court concluded the April 23 Hearing by recommending that the Debtor obtain counsel for the Debtor's bankruptcy case.[51]

15. After the April 23 Hearing and prior to the next hearing, the Debtor made various other filings.[52] Additionally, on May 1, 2025, the Trustee filed a notice to various creditors of the Debtor who were undisclosed in the Debtor's Petition (the "Debtor's Undisclosed Creditors")[53] to which objected the Debtor on May 6, 2025.[54]

---

do,"); *id.*, 21:24–22:2 (the Debtor's statement that the Properties Conveyances "were for asset protection that was consistent with tribal customs and private cultural governance")..

[48] *See* April 23 Hearing Transcript, at 32:2–32:9. ("I know the Trustee mentioned about the deficit. Again, during the process of this I have been afforded some opportunities to go on ahead—I've taken up some courses or enrolled in some courses through the tribe to go on ahead and compensate and be able to pay the creditors in full so that that could be done.").

[49] *See* Order Sustaining Objection of Trustee to Exemptions [Doc No. 48].

[50] *See* Order Denying Debtor's Motion to Dismiss [Doc No. 49].

[51] *See* April 23 Hearing Transcript, 33:20–34:15.

[52] On April 25, 2025, the Debtor filed a duplicate version of the First Chapter 11 Conversion Motion. s*ee Motion to Convert Case from Chapter 7 to Chapter 11* [Doc 44] (the "Second Chapter 11 Conversion Motion"). On May 6, 2025, the Debtor filed *Motion for Specific Relief* [Doc. No. 52] (the "Specific Relief Motion"). On May 22, 2025, the Debtor filed the *Motion and Memorandum: Ruling that Tribal Property is not property of the Estate* [Doc. No. 56] (the "First Tribal Property Motion").

[53] *See Notice of Bankruptcy Filing* [Doc. No. 47] (sending notice to Rocket Mortgage, the Internal Revenue Service (the IRS), the North Carolina Department of Revenue (the NCDOR), and the Mecklenburg County Tax Office).

[54] *See Response to Trustee's Notice of Bankruptcy Filing* [Doc. No. 50] (disputing the Debtor's Undisclosed Creditors should have been notified because, (1) as to Rocket Mortgage, "the Debtor is not seeking to discharge any mortgage debt," (2) as to the IRS and the NCDOR, the "Debtor has no outstanding tax liabilities or active repayment," and (3) as to the Mecklenburg County Tax Office, it "does not hold an unsecured or secured claim against the Debtor" and the Debtor's "property taxes are paid in the normal course through escrow accounts," wherefore, "no delinquent or defaulted debt exists").

## 2.   The May Hearing and Further Filings

16.     On May 27, 2025, the Court held a hearing (the "May Hearing")[55] on various filings by the Debtor. During the May Hearing, the Bankruptcy Administrator cross-examined the Debtor, wherein the Debtor first acknowledged the Rental Income as well as another undisclosed account of the Debtor's Accounts where the Rental Income was deposited.[56] The Debtor testified she thought that even "if [her] name [was] on the account but it belongs to the Tribe, [she] d[id]not need to list [ ] or disclose it."[57] When asked whether any other undisclosed accounts existed, the Debtor admitted to having another account that was opened after the Petition Date,[58] but falsely stated only these two accounts of the Debtor's Accounts existed.[59]

17.     When asked about the Debtor's assertion of expected income from the Debtor's Tribal Courses at the April 23 Hearing, the Debtor testified that she had completed courses through the Tribe on genealogy, cosmology, and other topics.[60] She testified that she began the Debtor's Jurist Course in February 2025, had paid the requisite fee, and was currently enrolled.[61] The Debtor could not explain how these courses would engender the income she had asserted they would.[62] As to the Debtor's Jurist Course, the Debtor described it as covering "nationality, law" and "[t]he

---

[55] *See Transcript for Hearing/Trial held on 5/27/2025* [Doc. No. 181] (the "May Hearing Transcript"); *see also Courtroom Recording on May 27, 2025, at 09:55:00 AM* [Doc. No. 62] (29 seconds); *Courtroom Recording on May 27, 2025, at 10:55:47 AM* [Doc. No. 63] (59 minutes); *Courtroom Recording on May 27, 2025, at 11:22:02 AM* [Doc. No. 64] (26 minutes); *Courtroom Recording on May 27, 2025, at 11:52:15 AM* [Doc. No. 65] (4 minutes); *see also Exhibit(s) for Hearing on 5/27/25* [Doc. No. 58].
[56] *See* May Hearing Transcript, at 30:20–31:23
[57] *See id.*, at 32:5–32:8; *see also id.*, at 50:8–53:24.
[58] *See id.*, at 32:9–32:23.
[59] *See id.*, at 32:24–33:7.
[60] *See id.*, at 44:7–44:21.
[61] *See id.*, at 42:19–44:6.
[62] *See id.*, at 44:7–44:21.

denationalization of individuals that are looking to reclaim their status"[63] and denied that anything the Debtor learned from the Debtor's Jurist Course informed the Debtor's Petition.[64]

18.    The Debtor also testified that she had made no payments to the Tribe other than for Debtor's Tribal Courses and one donation of $300 the previous year.[65] She further testified that she had been involved with the Tribe since "maybe 2022."[66] Finally, the Debtor testified, not on cross but in her own affirmative submission, that the Tribe was willing to provide additional funds to help her repay her debts outside of a Chapter 7 case.[67]

19.    Although the Debtor testified to the facts just canvassed, the Debtor testified that she could not recall answers to many questions, most of which, conveniently, pertained to matters the Debtor appears to have tried to conceal from the bankruptcy proceedings, such as those relating to the Nevin Property, the Rental income,[68] and others matters.[69] This would begin a trend

---

[63] *See id.*, at 54:11–54:18.
[64] *See id.*, at 54:19–54:21.
[65] *See id.*, at 56:17–58:2.
[66] *See id.*, at 60:1–60:2.
[67] *See id.*, at 60:12–61:23.
[68] *See id.*, at 22:5–24:1 (the Debtor's statement she could not remember details as to how much her monthly mortgage payment for Nevin Property was despite paying it monthly and having done so that same month or even confirm an estimate of it being below or about $1,000 or remember the original amount); *id.*, at 26:5–26:8 (same as to the names of who rented the Nevin Property from her); *id.*, at 26:15–27:3 (same as to the entity that employed the Nevin Property's property manager or how long property manager had worked there or when they first met); *id.*, at 30:1–30:4 (same as to how much the mortgage for Nevin Property had been refinanced to or even "[b]allpark" it); *id.*, at 30:24–31:18, 33:8–33:15 & 50:22–50:24 (same as to the name of the bank where an account belonging to Holt Solutions was held and where the Nevin Property mortgage payments were made from, when she opened the account, how much was held in it, or if any deposits to it had been made); *id.*, at 36:5–36:12 (same as to the full extent of maintenance done to the Nevin Property in the last year); *id.*, at 39:16–40:2 (same as to whether the Rental Income had been paid that month).
[69] *See id.*, at 34:21–34:25 (same as to who prepared her 2023 tax returns); *id.*, at 43:8–43:9 & 44:3–44:4 (same as to how much she had paid for Tribal Courses); *id.*, at 56:14–56:16 (same as to whether the Trustee had asked her about the Conveyances at the January 341 Meeting); *id.*, at 59:24–60:7 (same as to when she had purchased her vehicle and whether or not it had occurred before or after she joined the Tribe).

14

throughout the May and subsequent hearing of the Debtor not recalling matters apparently when doing so was convenient for the Debtor.[70]

20.      Due to this testimony, the Court orally directed the Debtor to provide the Trustee and Bankruptcy Administrator with certain "information" needed, including any information as to any undisclosed bank accounts (the "May Accounts Directive"), tax returns (the "May Tax Returns Directive"), leases (the "May Leases Directive"), and "any of the course information" (the "May Course Documents Directive," and together with the May Bank Directive, the May Tax Returns Directive, and the May Leases Directive, the "May Oral Directives").[71] The Court explained to the Debtor that the Trustee's role in the bankruptcy case obliged her to seek and review such information.[72]

21.      Following the May Hearing and prior the next hearing, the Parties made various further filings. On May 28, 2025, the Trustee initiated the Adversary Proceeding, asserting, *inter alia*, that the Conveyances were fraudulent and that the Properties should be brought back into the bankruptcy estate for the benefit of the Debtor's creditors.[73] The next day, the Debtor filed an *Answer to Complaint* [Adv. Pro. Doc. No. 6], wherefore the Court entered the *Court Memo to Individual re: Attorney Representation* [Adv. Pro. Doc. No. 7] (the "Court Representation Memo"), informing the Debtor that she could not represent Holt Solutions and would need to obtain counsel to litigate the Adversary Proceeding. The Debtor also made further filings seeking to end her

---

[70] *See infra* notes 91–92 and accompanying text (the June 23 Hearing); note 109 and accompanying text (the July 7 Hearing); notes 126 & 131 and accompanying text (the July 21 Hearing); notes 152, 156–159, & 174 and accompanying text (the September Hearing); notes 192–194, 198, 200 and accompanying text (the October Hearing); notes

[71] *See id.*, at 64:11–64:21.

[72] *See id.*, at 64:21–66:11.

[73] *See Adversary case 25-03032. Complaint 13 by Melanie D. Johnson Raubach, Chapter 7 Trustee against Holt Solutions, LLC* [Doc. No. 66]; *see also Adversary case 25-03032. Complaint 13 by Melanie D. Johnson Raubach, Chapter 7 Trustee against Holt Solutions, LLC* [Adv. Pro. Doc. No. 1].

Chapter 7 Base Case or effectuate a resolution obtaining the treatment she had sought through the

Debtor's Tribal Exemptions.[74] On June 9, 2025, the Debtor filed the *Amended Schedule J, Cover*

*Sheet* [Doc. No. 78] (the "First Amended Schedule"). The First Amended Schedule again provided

as the Debtor's income the Debtor's Asserted Income which omitted the Rental Income.[75]

### D. June Facts

#### 1. The June 9 Hearing and Further Filings

22.    On June 9, 2025, the Court held a hearing (the "June 9 Hearing")[76] on one of the

Debtor's pleadings regarding the Debtor's tribal assertions. The Debtor again argued that the

Properties were unrecoverable due to their tribal status from the Conveyances and that such

conveyances are standard tribal practice.[77] After rebuttal as to the merits of these arguments by the

---

[74] *See Motion to Convert Case from Chapter 7 to Chapter 13* [Doc. No. 68] (the "Chapter 13 Conversion Motion"); *Motion to Refer Matter to Mediation Pursuant to LBR 9019-2* [Doc. No. 69] (the "Mediation Motion"); *Motion and Memorandum: Ruling that Tribal Property is Not Property of the Estate* [Doc. No. 70] (the "Second Tribal Property Motion"); *Motion to Compel Trustee to Provide Proposed Settlement Amount for Full Repayment of Creditors and Estate Administrative Costs* [Doc. No. 71] (the "Compel Settlement Motion"); *Memorandum* [Doc. No. 77] (the "Memorandum").

[75] *See* First Amended Schedule, p. 4.

[76] *See Transcript for Hearing/Trial held on 6/9/2025* [Doc. No. 182] (the "June 9 Hearing Transcript"); *see also Courtroom Recording on June 9, 2025, at 10:21:08 AM* [Doc. No. 82] (the "June 9 Hearing Recording") (39 minutes).

[77] *See* June 9 Hearing Transcript, at 3:17–7:5 (arguing that that the Properties could not be liquidated as part of the usual practice for a Chapter 7 debtor's estate because the Conveyances made the Properties 'tribal property' and thus unavailable for such liquidation recovery, which she again asserted this was customary practice for tribal entities); *id.*, at 7:7–10:11 (arguing that the Conveyances are not prohibited unless fraudulent which they were not because they were done more than 20 months before filing and the Debtor was not involvement at the time and given her recent efforts to pay her creditors and her transparency regarding the Conveyances since the January 23 341 Meeting).

The Debtor also argued that the Trustee's previous analogies of the Debtor's Tribal Exemptions to exemptions claimed by asserted sovereign citizens had been prejudicial to the Debtor and created bias as to her asserted tribal status. *See id.*, at 10:13–12:5. The Court did directly respond to this third argument by explaining that the Trustee's analogies did not function to say the Debtor's asserted tribal status was the same as sovereign citizens claimed statuses. *See id.*, at 12:6–12:18 ("Ms. Ford, just so you know, everybody is supposed to -- we just read the cases. And so, it's her job, as it's your job, is to convince us. So, you know, as far as the bias, she just have to provide case law which might be illustrative, but a lot of times you provide case law that you know might not be exactly the same but may help guide the Court's decision-making process. So I am listening to everything you're saying, I just want you to know that sometimes just because

Trustee[78] and the Bankruptcy Administrator,[79] the Bankruptcy Administrator also informed the Court that the Debtor had done nothing to comply with the Court's May Oral Directives and specifically did not comply with the May Accounts Directive and the May Leases Directive when the Bankruptcy Administrator's offered the Debtor an opportunity to do so.[80] After the Debtor replied to the merits of the Trustee's and the Bankruptcy Administrator's rebuttal,[81] the Court queried the Debtor as to her compliance with the May Oral Directives, the Debtor acknowledge she had not taken any actions to comply.[82] Additionally, after discussion of the Trustee's efforts to notify the Debtor's creditors, the Court explained to the Debtor that the Trustee was obligated to send such notice and this was one reason which made the Debtor's compliance with the May Accounts Directive so important in order to progress the Debtor's case.[83]

23.     Later the same day as the June 9 Hearing, the Debtor filed the *Motion for Protective Order to Limit Discovery* [Doc. No. 81; Adv. Pro. Doc. No. 13] (the "First Protective Motion") in

---

you cite case law, just as you've cited case law, you know that's not exactly your same fact pattern, but it might help guide the Court, and I think Ms. Raubach is just trying to do that, as well."). The Debtor responded that she "underst[ood] and [ ] respect[ed] what [the Court was] saying," but that the nonetheless, just the Trustee making the analogy created bias and was prejudicial. *See id.*, at 12:19–14:8.

[78] *See id.*, at 14:12–15:19 (arguing that that the First Tribal Property Motion mischaracterized the Properties as still part of the Debtor's Estate, just unrecoverable, when in reality they were not part of the Debtor's estate given the Conveyances, wherefore she had brought the Adversary Proceeding).

[79] *See id.*, at 15:23–17:10 (arguing that the assertions made by the Debtor in support of the First Tribal Property Motion replicated those made previously by the Debtor which the Court rejected when it granted the Exemptions Objection, concurring with the Trustee as to the Conveyances' effect, and arguing that the Debtor was not proceeding in good faith but to keep her assets by avoiding the required rules for a Chapter 7 case).

[80] *See id.*, at 17:11–17:22.

[81] *See id.*, at 18:6–19:9 (reiterating that Tribal entity holds the deed, stating that the Debtor is not wasting resources, insisting that the Debtor has funds to pay creditors in full and wants a settlement number, and denying that the Debtor was hiding assets or acting in bad faith),

[82] *See id.*, at 19:10–19:18 ("No, Your Honor. And that is -- even that is under Tribal jurisdiction. All of that is under Tribal jurisdiction, Your Honor. And I do understand that she would like it. Again, it's under Tribal jurisdiction").

[83] *See id.*, at 25:17–26:9 (the Court correcting the Debtor's argument that Rocket Mortgage should not be notified as it was not relevant to bankruptcy because Rocket Mortgage could move to foreclose given their secured status, by pointing out the Debtor was mixing up laws and that such creditors could not so foreclose specifically because of the bankruptcy case, but were needed to be known for the case to move along).

both the Chapter 7 Base Case and the Adversary Proceeding. The Debtor filing the First Protective Motion in the Adversary Proceeding without counsel contravened the Court's Local Rule 2090-1, the Court Representation Memo, and the Court's explicit delineation to the Debtor of the same at the June 9 Hearing,[84] as did another motion the Debtor filed the same day in the Adversary Proceeding.[85]

24.    On June 20, 2025, the Debtor also filed the *Amended Statement of Income, Schedule J, Cover Sheet* [Doc. No. 105] (the "<u>Second Amended Schedules</u>," and together with the First Amended Schedule, the "<u>Amended Schedules</u>"). The Second Amended Schedules repeated the false statement from the Debtor's Petition as to the nonexistence of the Rental Income specifically[86] and as to the Debtor's Asserted Income, it again omitted the Rental Income as part of the Debtor's income.[87]

---

[84] *See id.*, at 20:10–22:3 (denying the First Tribal Property Motion because there was no justiciable controversy yet for the Court to decide (1) because the First Tribal Property Motion made arguments as to matters involved the Adversary Proceeding and Holt Solutions, and (2) because Holt Solutions required counsel for it to be present before the Court pursuant to the Court's Local Rule 2090-1 and counsel had not yet been obtained); *see also Order Denying Motion* [Doc. No. 84].

[85] *Motion to Dismiss Adversary Proceeding for Sovereign Immunity & Jurisdiction & Lack of Subject Matter Jurisdiction* [Adv. Pro. Doc. No. 12]. On June 12, 2025, the Trustee filed the *Motion to Strike Ryan Ford's Filings and Trustee's Request for a Deadline for Defendant to Retain Counsel* [Adv. Pro. Doc. No. 17], which the Court granted on July 10, 2025, *see Order Granting Motion to Strike Ryan Ford's Filings and Trustee's Request for a Deadline for Defendant to Retain Counsel* [Adv. Pro. Doc. No. 32], directing the Debtor to obtain counsel for Holt Solutions by August 10, 2025 (the "<u>Obtaining Representation Directive</u>").

[86] *See* Second Amended Schedules, p. 3.

[87] *See* Second Amended Schedules, p. 8.

### 2. The June 23 Hearing, the Reference Withdrawal Motion, and Further Filings

25.     On June 23, 2025, the Court held a hearing (the "June 23 Hearing")[88] on various prior filings by the Debtor.[89] During consideration of one such filing, the Bankruptcy Administrator informed the Court that the Debtor still had not complied with some of the directives under the May Oral Directives.[90] The Trustee and Bankruptcy Administrator cross-examined the Debtor during the June 23 Hearing, wherein the Debtor again failed to recall details as to key matters, such as her compliance to date with the May Oral Directives,[91] the Nevin Property, and the Rental Income.[92]

---

[88] *See Transcript for Hearing/Trial held on 6/23/2025* [Doc. No. 184] (the "June 23 Hearing Transcript"); *see also Courtroom Recording on June 23, 2025, at 10:33:28 AM* [Doc. No. 112] (53 minutes); *Courtroom Recording on June 23, 2025, at 10:40:19 AM* [Doc. No. 113] (1 minutes); *Courtroom Recording on June 23, 2025, at 10:45:17 AM* [Doc. No. 114] (4 minutes); *Courtroom Recording on June 23, 2025, at 11:22:01 AM* [Doc. No. 115] (10 minutes).

[89] *See* June 23 Hearing Transcript, at 7:7–20:1 (hearing arguments on the Chapter 13 Conversion Motion); *id.*, at 20:7–23:10 (hearing arguments on the Mediation Motion); *id.*, at 23:11–25:5 (not hearing arguments on the Second Tribal Property Motion because it replicated arguments which the Debtor had made in the First Tribal Property Motion and which the Court had rejected); *id.*, at 25:6–31:24 (hearing arguments on the Memorandum); *id.*, at 31:25–36:6 (hearing arguments on the Compel Settlement Motion); *id.*, at 36:8–39:8 (hearing arguments on the First Protective Motion first in the Chapter 7 Base Case); *id.*, at 39:9–43:10 (hearing arguments the First Protective Motion in the Adversary Proceeding and the Adversary Proceeding Dismissal Motion).

[90] *See id.*, at 7:7–8:15; *id.*, at 8:24–9:9 (the Bankruptcy Administrator statement asserting that the Chapter 13 Conversion Motion should be denied because, *inter alia*, the Debtor's noncompliance to date with the with the May Accounts Directive and the May Leases Directive made it inappropriate at that time).

[91] *See id.*, at 11:3–13:2 & 13:9–13:20 (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor testifies that she could not recall (1) whether she received an email from the Bankruptcy Administrator sent on May 28, 2025, (2) whether the Bankruptcy Administrator had presented a printout of the email to the Debtor in person prior to the June 9 Hearing, (3) whether she had received emails from the Bankruptcy Administrator's office providing notice of the Holt Solutions Document Production Motion, or (4) when the Debtor had last used her email, but could recall enough to confirm that the emails had been sent to the Debtor's email address); *id.*, at 16:23–19:8 (the Trustee and the Debtor's exchange where the Trustee reminds the Debtor about an email the Debtor had sent to the Trustee three days prior on June 23, 2025, wherein the Debtor asserts she was making efforts to comply with the documents requested by the May Accounts Directive and the May Leases Directive, which the Debtor confirmed at the June 23 Hearing but could not recall certain details as to those actions).

[92] *See id.*, at 14:10–16:17 (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor testifies that she could not recall (1) whether the July Rental Income had been paid, (2) whether communications between her and the property manager had occurred regarding a July Rental Income payment, (3) what the date of a Rocket Mortgage payment was, or (4) what the bank's name where the account in Holt Solutions' name was located and the Rental Income was paid).

26.      The Court concluded the June 23 Hearing with an oral ruling[93] which was reduced to written form and entered on June 23, 2025, as the *Order from Omnibus Hearing on June 23, 2025* [Doc. No. 111; Adv. Proc. Doc. No. 19] (the "June Omnibus Order," together with the May Oral Directives, the "May and June Orders"). The June Omnibus Order, after first denying various filings of the Debtor's hearing at the June 23 Hearing,[94] made five directives to the Debtor, specifically:

- (1) Barring the Debtor from litigating on behalf of Holt Solutions (the "June Holt Solutions Representation Directive");
- (2) Directing the Debtor to provide the Trustee and Bankruptcy Administrator with any of the Debtor's and Holt Solutions' bank account information (the "June Accounts Directive," and together with the May Account Directive, the "May and June Accounts Directives");
- (3) Directing the Debtor to provide the Trustee and Bankruptcy Administrator with any of Holt Solutions' tax returns (the "June Tax Returns Directive," and together with the May Tax Returns Directive, the "May and June Tax Returns Directives");
- (4) Directing the Debtor to provide the Trustee and Bankruptcy Administrator with any lease agreements for either of the Properties (the "June Leases Directive;" together with the May Leases Directive, the "May and June Leases Directives," which, together with the May and June Course Documents Directives, the May and June Tax Returns Directives, and the June Holt Solutions Representation Directive, the "May and June non-Tribal Directives");
- (5) Directing the Debtor to provide the Trustee and Bankruptcy Administrator with any documents for the Debtor's Tribal Courses (the "June Courses Documents Directive;" together with the May Course Documents Directive, the "May and June Courses Documents Directives," which, together with the May and June non-Tribal Directives, the "May and June Directives").[95]

The June Omnibus Order set a deadline of June 27, 2025, for the Debtor's compliance,[96] directed the Trustee or the Bankruptcy Administrator to file a report on the Debtor's compliance after this

---

[93] *See id.*, at 43:19–51:9.
[94] *See* June Omnibus Order, pp 3–4, decretal ¶¶ 1–4.
[95] *See id.*, p. 4, decretal ¶ 6.
[96] *See id.*, p. 4, decretal ¶ 7.

deadline,[97] and set a status hearing for the Debtor's compliance on July 7, 2025 (the "July 7 Hearing").[98]

27.     On June 27, 2025, the Debtor filed the *Motion to Withdraw Reference* [Doc. No. 121; Dist. Ct. Doc. No. 1] (the "Reference Withdrawal Motion"), which sought to withdraw her case from this Court to the District Court. The same day, the Debtor sent a cease-and-desist letter to the Trustee alleging that the Trustee had committed libel and defamation against the Debtor and the Tribe. *See Notice of Receipt of Correspondence from Debtor to Trustee "Official Notice to Cease and Desist"* [Doc. No. 124] (the "Cease and Desist Letter").

28.     On July 3, 2025, the Trustee and the Bankruptcy Administrator filed the *Joint Report (of Bankruptcy Administrator and Trustee) of Status of Debtor's Compliance with Order from Omnibus Hearing on June 23, 2025, and Request for Sanctions* [Doc. No. 125; Adv. Proc. Doc. No. 29] (the "First Status Report"). The First Status Report reported that the Debtor had started to comply with the June and May Bank Accounts Directives by providing some account statements, but also reported that this (1) did not include either some or all statements for the accounts requested as well as (2) had revealed more of the Debtor's Accounts of which the Trustee and the Bankruptcy Administrator were previously unaware.[99] The First Status Report also reported that the Debtor had not taken any actions to comply with the May and June Tax Returns Directives and the May and June Courses Documents Directives, and had not fully complied with the May and June Leases Directives.[100] Thus, the First Status Report requested that the Court

---

[97] *See id.*, p. 4, decretal ¶ 8.
[98] *See id.*, p. 4, decretal ¶ 9.
[99] *See* First Status Report, pp. 2–3.
[100] *See id.*, pp. 3–4 (reporting that the Debtor had taken no actions to comply with the May and June Tax Returns Directives and the May and June Courses Documents Directives and had provided for the May and June Leases Directives, a 2024 amendment, but not the original copy).

"[f]ind the Debtor in civil contempt of the [June] Omnibus Order and permit the Debtor to purge

her contempt by paying … $100.00 per day beginning on July 7, 2025, until she fully complies."[101]

29.     On July 7, 2025, the Debtor responded to the First Status Report. *See Response to Joint Report of Status of Debtor's Compliance with Omnibus Order and Objection to Request for Sanctions* [Doc. No. 127] (the "First Status Report Response"). The First Status Report Response objected to the May and June Course Documents Directives on the grounds that her compliance with the directives would violate copyright[102] and the directives were irrelevant to her bankruptcy case.[103] However, the First Status Report Response stated, the Debtor "intends to comply with the remaining provisions of the [June Omnibus Order] and is actively gathering the requested financial records" and "and will produce them as soon as they are collected."[104]

## E.  July through August Facts

### 1.  The July 7 Hearing

30.     The Court next held the July 7 Hearing[105] as a status conference on the Debtor's compliance with the May and June Orders. As to the First Status Report Response' assertion that

---

[101] *See id.*, pp. 7–8.

[102] *See* First Status Report Response, ¶¶ 3–4 (stating that that Debtor's Tribal Courses' materials "are proprietary intellectual property of the course provider and are protected by federal copyright and trademark law," and "[u]nder 17 U.S.C. §106, [only] a copyright owner" may "reproduce, create derivative works, and distribute the copyrighted content," wherefore, since "Debtor did not author or own the tribal course content and holds no license to redistribute it," her disclosure "would violate those exclusive rights."

[103] *See id.*, ¶¶ 7–8 (stating that the May and June Course Documents Directives are "overbroad request[s] beyond the scope of legitimate discovery" because they "ha[ve] no apparent relevance to Debtor's financial affairs, assets, or estate administration," wherefore, they are "outside the scope of a proper Rule 2004 examination").

[104] *See id.*, ¶¶ 5–6 (stating these directives in the May and June Orders other than the May and June Course Documents Directives "fall[ ] squarely within the scope of a Rule 2004 examination, which permits inquiry into the debtor's property, liabilities, and financial condition" because they seek documents that "are clearly relevant to the estate and under Debtor's control and there is no dispute about providing them").

[105] *See Transcript for Hearing/Trial held on 7/7/2025* [Doc. No. 185] (the "July 7 Hearing Transcript"); *see also Courtroom Recording on July 7, 2025, at 10:08:00 AM* [Doc. No. 128] (20 minutes); *Courtroom Recording on July 7, 2025, at 11:17:32 AM* [Doc. No. 129] (38 minutes).

the Debtor was trying to comply with the May and June non-Tribal Directives, the Bankruptcy Administrator rebutted on the grounds that the Debtor's explanation did not explain her outstanding noncompliance with all the May and June non-Tribal Directives. The Bankruptcy Administrator asserted that the May and June Leases Directives could be easily and quickly fully complied with by the Debtor's contacting the Nevin Property's property manager.[106] As to the First Status Report Response' copyright and relevancy objection to the May and June Courses Documents Directives, the Bankruptcy Administrator rebutted on the grounds that the Debtor was just arguing she did not need to comply because she did not want to comply.[107] The Trustee joined the Bankruptcy Administrator's and highlighted that the Debtor had approximately a seven week period since the May Oral Directives to comply at least with the May and June non-Tribal Directives.[108]

31.     The Debtor was cross examined by the Trustee and the Bankruptcy Administrator as to the account statement production to date, any undisclosed accounts, the Debtor's Petition, and the Tribe; the Debtor could not remember details.[109] This testimony revealed more of the Debtor's Accounts.[110] After the cross-examination, the Trustee reminded the Debtor that she could

---

[106] *See* July 7 Hearing Transcript, at 11:8–13:16.

[107] See id.

[108] *See id.*, at 13:19–14:1.

[109] *See id.*, at 21:24–33:13 (the Debtor's responses that she could not recall answers: as to (1) one Bluevine account, specifically, (a) what one deposit to it was for and (b) why one of its statement referenced another account owned by the Debtor at a different undisclosed bank, (c) whether Holt Solutions owned an account at that bank (but could confirm that she personally did not own such an account); as to (2) another Bluevine account, specifically, (a) what a transfer to it labeled as for Nevin Property was specifically or, (b) whether it still existed or when she last accessed it, (c) when she last deposited into it (but could confirm it was in Holt Solutions' name); as to (3) a non-Bluevine account, specifically, (a) when the Debtor closed it, (b) why she did closed it, and (c) what she had used it for (but could confirm she owned it); on (4) whether the Debtor's Petition had directed the Debtor to report all accounts she owns; on (5) whether the Debtor or Holt Solutions owned any other further undisclosed accounts; on (6) exactly whether she or Holt Solutions owned a Bluevine credit card (but tentatively denied them so owning one); and, as to (7) the Tribe, (a) what its address was, (b) who a contact person was, or (c) any identifying details or any details related to the Debtor's Tribal Courses or the Debtor's Jurist Course)

[110] See id.

easily download the overdue account statements online..[111] The Bankruptcy Administrator noted

that the fact that May and June Account Directives directed the Debtor to provide statements for

all accounts she owned, not only those requested which the Debtor produced, challenged the

Debtor's assertion she was attempting to comply with the May and June non-Tribal Directives.[112]

32.    The Court concluded the July 7 Hearing with an oral ruling[113] which was reduced

to written form and entered on June 23, 2025, as the Contempt Finding Order. The Contempt

Finding Order found the Debtor in civil contempt for her noncompliance with the May and the

June Orders,[114] but provided that the Debtor could purge this finding by complying with the May

and June Orders by, specifically, providing the Trustee and Bankruptcy Administrator with:

- (1) all statements for any and all of the Debtor's or Holt Solutions' accounts generally, and specifically, but not limited to, certain statements for certain identified accounts (the "July 7 Accounts Directives," and together with the May and June Bank Account Directives, the "May, June, and July 7 Account Directives"),
- (2) the lease agreements for either of the Properties (the "July 7 Leases Directives," together with the May and June Leases Directives, the "May, June, and July 7 Leases Directives"), and
- (3) the documents for the Debtor's Tribal Courses (the "July 7 Courses Documents Directives;" together with the May and June Courses Documents Directives, the "May, June, and July 7 Courses Documents Directives," which, together with the May, June, and July 7 Account Directives, the May, June, and July 7 Leases Directives, the "May, June, and July 7 Orders").[115]

The Contempt Finding Order set a deadline of July 17, 2025, for the Debtor's compliance[116] and

scheduled a status hearing on July 21, 2025 (the "July 21 Hearing") for determination of

compliance and imposing sanctions if the Debtor failed to comply.[117]

---

[111] *See id.*, at 34:18–36:13.
[112] *See id.*, at 36:16–38:25.
[113] *See id.*, at 40:3–44:18.
[114] *See* Contempt Finding Order, p. 2, decretal ¶ 1.
[115] *Id.*, pp. 2–3, decretal ¶ 2.
[116] See id.
[117] *See id*, p. 3, decretal ¶¶ 3–4.

33.     On July 10, 2025, the Debtor filed the *Motion for Recusal of Trustee and Bankruptcy Administrator* [Doc. No. 132] (the "Original Recusal Motion"). The Original Recusal Motion made various false allegations of fact.[118] On July 11, 2025, the Trustee and the Bankruptcy Administrator filed responses to Reference Withdrawal Motion at the District Court and[119] the Debtor replied on July 17, 2025. *See Reply to Opposition* [Dist. Ct. Doc. No. 17] (the "Original Reference Withdrawal Motion Response Reply"). The Original Reference Withdrawal Motion Response Reply contained various patent errors, such as alleging that the Trustee had sent the Debtor threatening voicemails (the "Voicemails Allegations")[120] and utilizing masculine pronouns interspersed with feminine pronouns, which the Debtor uses in general (the "Motion Pronoun Discordance"), suggesting that the pleading had been duplicated from one with a male-identifying individual.[121]

34.     On July 21, 2025, prior to the July 21 Hearing, the Bankruptcy Administrator and the Trustee filed a *Joint Report of Status of Debtor's Compliance with Order Finding Debtor in Civil Contempt* [Doc. No. 136] (the "Second Status Report"). The Second Status Report canvased (1) that the Bankruptcy Administrator and the Trustee had found some of the Debtor's Held Funds,[122] (2) that the Debtor had taken some actions to comply with the May, June, and July 7

---

[118] *See* Original Recusal Motion, ¶ 4 ("The Trustee wants to get debtor to disclose Tribe's confidential or proprietary property information not belonging to the Debtor's bankruptcy estate without authorization. This information—which may include intellectual property, business secrets, or other sensitive data—was revealed or used by the Trustee beyond the scope of her authority. The Bankruptcy Administrator was aware of, or failing to prevent, this disclosure. By exceeding her mandate and divulging estate information she had no authority to release, the Trustee breached her duty to safeguard estate assets and respect applicable privacy and property rights.").
[119] *See Joint Response and Objection to Plaintiff's Motion to Withdraw Reference* [Dist. Ct. Doc. No. 5]; *Joint Brief in Opposition to Plaintiff's Motion to Withdraw Reference* [Dist. Ct. Doc. No. 5].
[120] *See* Original Reference Withdrawal Motion Response Reply, ¶ 21 ("The Trustee … fails to address specific threats documented in the record (e.g. voice mails warning Debtor his liberty was at stake if he did not comply).").
[121] See, e.g., id.
[122] *See* Second Status Report, pp. 1–3.

Account Directives by providing some requested statements, but not all requested statements, (3) that her production revealed more of the Debtor's Accounts, displaying further noncompliance of the general part of the May, June, and July 7 Account Directives, and (4) that the Debtor had taken no action to comply with the May, June, and July 7 Courses Documents Directives.[123] The Second Status Report did not raise any compliance issues as to the May, June, and July 7 Leases Directives, wherefore it appears that the Debtor had fully complied with that directive prior to July 21, 2025.

### 2. The July 21 Hearing

35.    During the July 21 Hearing,[124] the Bankruptcy Administrator raised to the Court the Voicemails Allegations.[125] When the Court inquired what was the basis for the allegations, the Debtor stated she could not recall writing it.[126] The Court then directed the Debtor that she would need to file an amended version of the Original Reference Withdrawal Motion Response Reply.[127] Next, the Trustee addressed the Second Status Report,[128] and the Bankruptcy Administrator highlighted the volume of undisclosed Debtor's Accounts.[129]

36.    When the Court queried the Debtor as to the various outstanding compliance issues, the Debtor repeated that she was trying her best to comply with the May, June, and July 7 Bank Account Directives[130] but could not recall key details when pressed by the Court on the accounts.[131]

---

[123] *See id.*, pp. 3–4.
[124] *See Transcript for Hearing/Trial held on 7/21/2025* [Doc. No. 183] (the "July 21 Hearing Transcript"); *see also Courtroom Recording on July 21, 2025, at 10:09:14 AM* [Doc. No. 138] (21 minutes); *Courtroom Recording on July 21, 2025, at 11:31:51 AM* [Doc. No. 139] (38 minutes).
[125] *See* July 21 Hearing Transcript, at 6:17–7:15.
[126] *See id.*, at 7:16–8:7.
[127] *See id.*, at 8:8–8:11 (the Court's statement noting that the Debtor, notwithstanding being *pro se*, was still under a duty to tell the truth).
[128] *See id.*, at 9:22–14:25.
[129] See *id.*
[130] *See id.*, at 17:6–23:1.
[131] *See id.* (the Court's and the Debtor's exchange where the Debtor testifies that she could not recall (1) details regarding a Zelle transfer to an undisclosed account, (2) details regarding Coinbase account activity,

As to the May, June, and July 7 Courses Documents Directives, the Debtor asserted she could not comply as it would violate copyright and claimed she was "under duress" to commit a crime.[132]

37.     When the Court asked the Debtor to provide any argument regarding the mitigation of sanctions, the Debtor admitted "mistakes" in her attempts to comply with the May, June, and July 7 Bank Account Directives but repeated that she could not comply with the May, June, and July 7 Courses Documents Directives because it would be illegal, citing 11 U.S.C. § 541, 15 U.S.C. § 114, 17 U.S.C. §§ 504 and 505, 18 U.S.C. § 241, and the Indian Arts and Crafts Act.[133] The Court then engaged in the following exchange with the Debtor:

> Debtor: Through the order, Your Honor, I am being pressured and coerced into turning over this stuff that does not belong to me. Again, it belongs to the tribe and not myself… And if I am being threatened with sanctions and punishment for something that isn't mine, then obviously this causes me duress, and I am being forced to make decisions under pressure, fear, and intimidation. So, I'm really caught in the middle of something that. Umm.
> Court: Ms. Ford. Has . . . the tribe said this to you? Because we have told you that this law you are citing is completely inapplicable. So, can you please provide a name of who you are speaking to at the tribe that is asserting any of those arguments?
> Debtor: Your Honor, I cannot say any of that, but what I can say is that this would be a-a-against the law for me to do so.
> Court: Who have you spoken to the tribe, in, during this process?
> Debtor: That, I will not disclose.
> Court: Has the tribe threatened you with a lawsuit?
> Debtor: Your Honor, that I will not disclose.
> Court: And you understood my prior ruling, is that correct?
> Debtor: Which order?
> Court: You understood why copyright -- why your arguments do not apply?
> Debtor: No. I think they do apply.[134]

---

(3) whether she had provided statements for another account starting from June, or (4) whether she had provided or even remembered any related documents for another transfer, among others).
[132] See id.
[133] *See id.*, at 33:7–35:10. Of course, there is no section 114 in title 15 of the United States Code, which exemplifies the Court's concerns with the Debtor citing non-existent legal authorities and perhaps receiving misleading legal advice from the Debtor's Jurist Course.
[134] *See id.*, at 35:15–36:19.

38.     After taking the matter under advisement,[135] the Court entered the Contempt

Sanctions Order six days later. The Contempt Sanctions Order, after addressing the case facts[136]

and law allowing the Court to sanction a party found in civil contempt,[137] found:

- (1) that "the Debtor [had] either refused or otherwise failed to produce" what she was directed to produce under the May, June, and July 7 Orders;
- (2) that "the Debtor's assertions that she will be subject to legal action" for compliance with the May, June, and July 7 Courses Documents Directives were "not [ ] credible" because no evidence as to such had been provided;
- (3) that the May, June, and July 7 Courses Documents Directives sought documents important for "the Court to regulate the practice of law and potential abuses in practice against this Debtor by third parties" given the "he length and complexity of the Debtor's pleadings," "the false factual information contained in some pleadings[,] and the inapplicable or non-existent legal authorities cited therein," which "raise questions concerning the source of this material;"
- (4) that the at least $7,000 in funds the Debtor had not disclosed in her Petition questioned the Debtor's assertions of good faith as it may constitute perjury; and
- (5) that Debtor's actions had "impeded the enforcement of the Court Orders, delayed the progress of this case, and has disrupted the Parties' ability to fulfill their fiduciary duties;"[138]

Thus, the Contempt Sanctions Order found the Debtor again in contempt of the May Order, the

June Omnibus Order, and the Contempt Finding Order, having not complied with their directives

and acted in bad faith,[139] and imposed civil contempt fine of $100 to accrue daily beginning on the

day the Contempt Sanctions Order is entered (the "Contempt Fines").[140] The Contempt Sanctions

Order also (1) directed the Debtor to provide statements for specific identified accounts (the "July

21 Accounts Directives," together with the May, June, and July 7 Account Directives, the "May

through July 21 Account Directives"),[141] (2) provided that the Debtor could purge the contempt

findings and the Contempt Fines by complying with the May Order, the June Omnibus Order, the

---

[135] *See id.*, at 37:11–37:12.
[136] *See* Contempt Sanctions Order, pp. 2–9.
[137] *See id.*, pp. 9–10.
[138] *See id.*, pp. 10–12.
[139] *See id*, p. 13, decretal ¶¶ 3–5.
[140] *See id*, decretal ¶ 6.
[141] *See id*, decretal ¶¶ 7–8.

Contempt Finding Order, and Contempt Sanctions Order,[142] and (3) directed the Debtor to serve by mail a copy of the Contempt Sanctions Order to "any parties that the Debtor is aware may contest the relief provided under this order, including the Debtor's asserted tribe," prior to July 31, 2025, and file a certificate of service of the same prior to August 4, 2025 (the "July 21 Mailing Order to Tribal Entities Directive," which, together with the May, June, and July 7 Courses Documents Directives, the "May through July 21 Tribal Directives").[143]

### 3. Further July and August Filings

39.    On July 29, 2025, the Bankruptcy Administrator filed a motion for production to one Tribal Entity,[144] which the Court granted.[145] On July 31, 2025, the Bankruptcy Administrator filed notices of intent to subpoena further Tribal Entities at various addresses.[146] These attempts by the Bankruptcy Administrator to contact Tribal Entities appears to have been futile.

40.    On August 4, 2025, the Debtor filed *Motion for Continuance to Obtain Counsel and Request for Clarification on Representation Options* [Doc. No. 173] and the *Statement of Full Compliance with Court Orders and Request to Purge Contempt* [Doc. No. 174] (the "Debtor's First Statement of Full Compliance").

---

[142] *See id*, decretal ¶ 9.

[143] *See id*, decretal ¶¶ 15–16.

[144] *See* Ex Parte *Motion for Production of Documents Only from Aboriginal Republic of North America et al. Pursuant to Bankruptcy Rule* [Doc. No. 148].

[145] *See* Ex Parte *Order Granting* Ex Parte *Motion for Production of Documents Only from Aboriginal Republic of North America et al. Pursuant to Bankruptcy Rule 2004* [Doc. No. 149].

[146] *See Notice of Intent to Serve Subpoena on ARNA (Crown Rd. address)* [Doc. No. 153]; *Notice of Intent to Serve Subpoena on ARNA (Chestnut St. address)* [Doc. No. 154]; *Notice of Intent to Serve Subpoena on ARNA (P.O. Box address)* [Doc. No. 155]; *Notice of Intent to Serve Subpoena on Xi-Amaru Tribal Government* [Doc. No. 156]; *Notice of Intent to Serve Subpoena on Aboriginal University* [Doc. No. 157]; *Notice of Intent to Serve Subpoena on Amaru Xi-Ali D/B/A Xi Amaru Tribal Enterprises (Crown Road address)* [Doc. No. 158]; *Notice of Intent to Serve Subpoena on Amaru Xi-Ali d/b/a Xi Amaru Tribal Enterprises (Bradford Way address)* [Doc. No. 159].

41.     On August 13, 2025, the Trustee and the Bankruptcy Administrator filed the *Joint Response and Request for Hearing Status Report and Response and Objection (of Bankruptcy Administrator and Trustee) to Debtor's Statement of Full Compliance with Court Orders and Request to Purge Contempt* [Doc. No. 177; Adv. Proc. Doc. No. 46] (the "Third Status Report"). The Third Status Report asserted that the Debtor had done nothing to comply with the May through July 21 Tribal Directives and still had not fully complied with the May through July 21 Account Directives because there were still missing statements and the statements produced revealed more of the Debtor's Accounts.[147]

42.     On August 20, 2025, the Debtor filed the *Reply Opposing Default Judgment in Adversary Proceeding and Statement of Full Compliance with Court Order* [Doc. No. 179] (the "Debtor's Second Statement of Full Compliance"). On August 29, 2025, the Debtor filed the *Debtor's Statement of Full Compliance with Updated Status Report* [Doc. No. 209] (the "Debtor's Third Statement of Full Compliance"). The Debtor's Second and Third Statements of Full Compliance asserted that the Debtor did not need comply with the May through July 21 Tribal Directives because the Debtor believed those directives as irrelevant or infringing copyright.[148] On

---

[147] *See* Third Status Report, 2–7.

[148] *See* Debtor's Second Statement of Full Compliance, ¶ 7 ("In particular, regarding the item in Contempt Order ¶ 2(vii) (documentation of courses taken through the Debtor's asserted tribe), the Debtor understands – based on the Court's and Trustee's statements that "tribe" is not federally recognized – that such information is not pertinent to the bankruptcy estate or required for compliance. Thus, no tribal course documentation has been included, as the matter before the Court concerns only the Debtor's bankruptcy estate and the two real properties at issue."); *See id.*, ¶ 6 ("In compliance with the service requirements, the Debtor served copies of the July 29 Order on all parties known to the Debtor who might contest the relief. Specifically, on or before July 31, 2025, the Debtor provided a copy of the Order to the Chapter 7 Trustee and to the Office of the Bankruptcy Administrator (via electronic mail, with their consent). The Debtor is not aware of any other individual or entity that would contest the Order's provisions. (*With respect to the Debtor's previously asserted tribal affiliation, the Debtor notes that the Court has indicated there is no federally recognized tribe involved in this matter. Accordingly, the Debtor did not serve any "tribal" entity, as no such legally recognized party exists or is required to be notified in these proceedings*)." (emphasis added)); Debtor's Third Statement of Full Compliance, ¶ 1 ("Some of the information demanded – particularly involving tribal course materials – is outside the scope of bankruptcy and beyond the Debtor's legal right to produce.").

August 29, 2025, the Debtor also filed the *Amendment* [sic] *Motion for Recusal of Trustee and Bankruptcy Administrator* [Doc. No. 207] (the "Amended Recusal Motion"), in which she removed the false allegations in the Original Recusal Motion.

43.     On September 4, 2025, the Trustee and the Bankruptcy Administrator filed the *Joint Status Report and Response and Objection to Debtor's Statements of Full Compliance with Court Orders and Requests to Purge Contempt* [Doc. No. 211; Adv. Proc. Doc. No. 48] (the "Fourth Status Report"). The Fourth Status Report asserted that the Debtor had still done nothing to comply with the May through July 21 Tribal Directives and had not fully complied with the May through July 21 Account Directives, although the Debtor had narrowed her specific production requirements under the May through July 21 Account Directives.

## F.  September Facts

### 1.  The September Hearing and Further Filings

44.     On September 8, 2025, the Court held a hearing (the "September Hearing").[149] By the September Hearing, the Contempt Fines totaled $4,200 based upon the Debtor's continued noncompliance with the Contempt Sanctions Order. At the September Hearing, the Debtor appeared with counsel for the Adversary Proceeding and thus had fully complied with the Obtaining Representation Directive in the Adversary Proceeding.[150] For the status hearing as to

---

[149] *See Courtroom Recording on September 8, 2025, at 11:54:01 AM* [Doc. No. 214] (the "First September Hearing Recording") (59 minutes), *Courtroom Recording on September 8, 2025, at 12:07:21 AM* [Doc. No. 215] (the "Second September Hearing Recording") (13 minutes), *Courtroom Recording on September 8, 2025, at 1:39:07 PM* [Doc. No. 216] (the "Third September Hearing Recording") (1 hour), & *Courtroom Recording on September 8, 2025, 2025, at 2:08:37 PM* [Doc. No. 217] (the "Fourth September Hearing Recording") (29 minutes); *see also Exhibit List* [Doc. No. 218] (the "September Hearing Exhibits").

[150] *See* First September Hearing Recording, at 00:43–3:21. Although this compliance did not satisfy any of directives under the Contempt Finding and the Contempt Sanctions Orders or explicitly satisfy any of the directives under the May and June Orders, it did effectively satisfy the June Holt Solutions Representation Directive in the June Omnibus Order by precluding any further noncompliance of the same occurring. However, this did not dispose of the contempt matters overall in the Adversary Proceeding, since the May

the ongoing contempt, the Debtor first addressed May through July 21 Account Directives, which she asserted she was trying to comply but complained that the goalposts seemed to be moving and precluded the Debtor's full compliance.[151] When the Court directly queried the Debtor as various details about her compliance with the May through July 21 Bank Account Directives, the Debtor could not recall exact details or only offered tentative answers.[152]

45.     The Trustee asserted that there were still many outstanding requested account statements.[153] The Bankruptcy Administrator rebutted that the moving goalposts was because of the Debtor's own actions, specifically, her noncompliance with the May through July 21 Accounts Directives as it pertained to the Debtor's Accounts generally, and her limited compliance as to only the specifically requested accounts.[154]

46.     As to the May, June, and July 7 Courses Documents Directives, the Debtor repeated that she could not comply with those directives legally.[155] When the Court then directly queried the Debtor about discrete details about the Debtor's Tribal Courses and the Debtor's Jurist Course, the Debtor testified that she could not recall any such details, although she did not deny the

---

through July 21 Account Directives and the May through July 21 Tribal Directives were still outstanding. It is indisputable that the Debtor's compliance with May through July 21 Account Directives was necessary for the Adversary Proceeding to progress, and probably the case that her compliance with the May through July 21 Tribal Directives was also relevant, as those matters bore highly on the Conveyances as the central issue of the Adversary Proceeding. *See id.* (the Trustee's statement canvassing the same).

[151] *See id.*, at 4:33–28:06.

[152] *See id.* (the Debtor's statements and Court's and the Debtor's exchange where the Debtor testified that she could not recall (1) what the exact dates or periods were when certain accounts were used or closed or whether they were closed this year or last year, (2) any details related to other accounts for the period between February 2023 and May 2023 or for 2025, (3) whether she had previously disclosed certain accounts, including a savings account, (4) the exact nature or timeframe of her use of another account related to transfers, (5) the details for a transfer on February 14th, 2024 (6) the details regarding possibly lost documents from another account, or (7) the details regarding a co-op system for another account, among others).

[153] *See id.*, at 28:07–37:39.

[154] *See id.*, at 37:40–42:12.

[155] *See id.*, at 43:15–43:36 (the Debtor's statement: "Again, I don't, I don't have the right to go on ahead and um, give those. I don't have them. So, and I don't own them. So therefore, I can't give you something that I don't.").

existence of such courses and her enrollment therein.[156] When the Bankruptcy Administrator cross-examined the Debtor as to similar details, the result was similarly fruitless,[157] except that the Debtor first objected to one question as violating copyright and irrelevant before being unable to recall the answer after her objection was overruled,[158] and pled the Fifth Amendment on another question.[159]

47.     During closing, the Debtor again argued she could not comply with the Course Documents Order because they were irrelevant to bankruptcy matters and compliance would violate copyright, but that she was complying with the Directives concerning matters she deemed relevant to the bankruptcy case.[160] The Trustee concluded by noting that sanctions did not seem to

---

[156] *See id.*, at 43:36–46:37 (the Court's and the Debtor's exchange where the Debtor testifies she could not recall (1) what she paid for the Courses, (3) what materials she received, (3) how she took the Courses, (4) whether she finished them in July and August, or (5) who taught the Jurist Course, and could only recall enough to submit that the Jurist Course was "about nationality")).

[157] *See id.*, at 53:43–59:59 (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor testifies that she could not recall (1) what the website for the Debtor's Tribal Courses was, (2) exactly when the last time she was on that website (except that it had been months), or (3) when the Debtor's Jurist Course finished and if it July or was it August, and could only recall enough to tentatively deny receiving a certification from the Debtor's Jurist Course and tentatively reaffirm being a member of the Tribe since 2022).

[158] *See* Second September Hearing Recording, at 00:00–00:34 (the Bankruptcy Administrator's, the Debtor's, and the Court's exchange:
  Bankruptcy Administrator: Do you know what state [the Tribe is] in? Is that a no?
  Debtor: I object to the question.
  Bankruptcy Administrator: I'd ask that you be directed to answer your honor.
  Court: Please answer what's your basis for objection.
  Debtor: That it has no relevancy. It has no relevancy to my bankruptcy.
  Court: Objection denied.
  BA: What's the state?
  Debtor: I don't know.).

[159] *See id.*, at 00:35–01:58 (the Bankruptcy Administrator's, the Debtor's, and the Court's exchange where the Bankruptcy Administrator asks the Debtor who taught the Debtor's Jurist Course and if she could recall anything on them to which the Debtor does not respond, the Court directs the Debtor to respond, and the Debtor states she is "going to plead the 5th because [she] do[es]n't [ ] know what else to say").

[160] *See id.*, at 2:13 to 3:30 (the Debtor's statement: "Yes. Again, your honor, when it concerns any of the missing financial documents, I try to make sure that I'm producing what they're, um, the bankruptcy administrator and the trustee are requesting when it concerns those financial matters, um, again, if it's oversight of mine. I quickly try to um, correct that so that that is um, uh, given to them, so they have those, and again, making sure that everything is relevant to the, um, relevant to the estate. Um, with giving them their um, financial documents that they are requesting of me. Um, again, when it concerns the tribal

be working to get the Debtor to comply and would defer to the Court as to further escalation.[161]

The Bankruptcy Administrator concluded by requesting the Course increase the Contempt Fines

and deny the Debtor's discharge.[162] Finally, the Debtor repeated her goal to pay off her creditors

and argued that the May through July 21 Tribal Directives were precluding any such progress or

resolution of the case by distracting the matters.[163]

48.     The Court made an oral ruling as to the matters for the status hearing matters[164] and

entered in written form on October 7, 2025, as the Contempt Further Sanctions and Discharge

Order. The Contempt Further Sanctions and Discharge Order found that the Debtor continued to

be in civil contempt (the "September Contempt Finding") based on her noncompliance with the

June Omnibus Order and the Contempt Sanctions Order.[165] Next, the Contempt Further Sanctions

and Discharge Order directed the Debtor, as a condition for her to purge September Contempt

Finding, to take various action, specifically:

- (1) to provide to the Trustee and the Bankruptcy Administrator the documents for the Debtor's Tribal Courses (the "September Courses Documents Directives," together with the May, June, and July 7 Courses Documents Directives, the "May through September Courses Documents Directives");[166]
- (2) to "[s]erve by mail the Contempt Sanctions Order to "any parties that the Debtor is aware may contest the relief provided under the [that order], including the Debtor's asserted tribe," and file a Certificate of Service of the same (the "September Mailing Order to Tribal Entities Directive," together with the July 21 Mailing Order to Tribal Entities Directive, the "July and September Mailing Order to Tribal Entities Directive," which, together with the May through September Courses Documents Directives, the "May through September Tribal Directives");[167] and

---

documents, again, like I've stated before, um, they're not part of my bankruptcy, um, state, um, what the court is asking me to do is to break the law, and again, for, for trademark, and, um, copyright infringement, um, is definitely an overreach. Um, we're requesting those things that I, again, that I don't own, and I can't produce something that I don't own.").

[161] *See id.*, at 03:43–04:33.

[162] *See id.*, at 04:34–08:26.

[163] *See id.*, at 08:30–13:00.

[164] *See* Third September Hearing Recording, at 00:00–09:53.

[165] Contempt Further Sanctions and Discharge Order, p. 2.

[166] *See id*, decretal ¶ 1.a.

[167] *See id*, pp. 2–3, decretal ¶¶ 1.b–1.c.

- (3) to provide specific statements for various specific accounts including those for CashApp (the "September Accounts Directives," together with the May through July 21 Account Directives, the "May through September Account Directives").[168]

Lastly, the Contempt Further Sanctions and Discharge Order held that because of the September Contempt Finding, (1) the Court raised the Contempt Fines' daily accruing amount to $150 beginning on entry of the Contempt Further Sanctions and Discharge Order, and (2) the Court denied the Debtor's discharge, which the Court would not reconsider until the Debtor complied with the June Omnibus Order and the Contempt Sanctions Order.[169]

49.   After the Court made the oral ruling at the September Hearing, the Court heard the Recusal Motion. The Debtor proffered opening arguments reasserting prior failed arguments[170] and the Trustee rebutted.[171] The Bankruptcy Administrator's cross-examined the Debtor and presented evidence, which the Debtor confirmed, that the Debtor removed the false allegations from the Original Recusal Motion in the Amended Recusal Motion.[172] Specifically, the Bankruptcy Administrator addressed how the changes had not been based on the Debtor's own volition but were prompted by a letter that the Bankruptcy Administrator sent to the Debtor which threatened a motion for sanctions pursuant to Federal Rule of Bankruptcy Procedure 9011(c)(1) unless,

---

[168] *See id,* pp. 3–4, decretal ¶¶ 1.d.(1)–1.d.(13).

[169] *See id,* pp. 4–5, decretal ¶¶ 2.a–2.b.

[170] *See* Third September Hearing Recording, at 12:49–33:57 (the Debtor's statement arguing that the Trustee's and the Bankruptcy Administrator's actions in the case so far had been improper, asserting, specifically, that (1) their actions relating to the Tribal Directives were illegal because those actions violated copyright and were extralegal under the Trustee's and Bankruptcy Administrator's duties because the Tribal Directives involved matters outside the scope of bankruptcy, that (2) their Sovereign Citizen Analogies displayed prejudicial debtor against the Debtor, that (3) the overall facts of the Trustee's and the Bankruptcy Administrator's conduct in the case displayed that they were adverse to the Debtor's interests, that (4) the first three facts suggested that the Trustee and the Bankruptcy Administrator had an improper motive driving their actions, such as status or money, and that (5) the Debtor's Bar Complaint had conflicted the Trustee as to the Debtor).

[171] *See id.,* at 34:00–37:43 (succinctly arguing that a debtor's disagreement as to how a Chapter 7 trustee executes their lawful duty or a debtor's manufacturing of a conflict between the debtor and a trustee did not suffice for recusal).

[172] *See id.,* at 38:12–55:21.

pursuant to the "safe harbor" provision under Federal Rule of Bankruptcy Procedure 9011(c)(2)(B), the Debtor made the changes.[173]

50.     The Bankruptcy Administrator asked the Debtor whether she had ever been sanctioned by a court outside of the case before this Court, which the Debtor initially responded by testifying that she could not recall.[174] Then, the Bankruptcy Administrator presented to the Court an order from the Mecklenburg County district court entered on December 4, 2023 which ordered the Debtor to pay her ex-husband $8,000 in sanctions under N.C. Gen. Stat. § 1A-1, Rule 11 (the "State Court Sanctions Order").[175] The State Court Sanctions Order, the Debtor confirmed, was ordered based on findings that the Debtor had, in a custody dispute between the Debtor and her ex-husband, (1) "verified a pleading which contained facts and statements of law that were insufficient to satisfy the grievances [that the Debtor] alleged," (2) "that [the Debtor's] allegations as they relate to [the Debtor's ex-husband] were not credible and were therefore, factually insufficient," and (3) were "filed for an improper purpose."[176]

51.     During closing, the Debtor argued that the State Court Sanctions Order did not impugn her credibility and she repeated her opening arguments.[177] The Bankruptcy Administrator concluded by noting that (1) she was executing her duties including investigating the potential unauthorized practice of law, and that (2) the Recusal Motion was really just a collateral attack on

---

[173] See id.

[174] *See id.*, at 55:35–55:55.

[175] *See id.*, at 55:55–59:45.

[176] *See id.*; September Hearing Exhibits, Exhibit BA1, pp. 31–35; *see also Ford v. Ford*, No. 18-CVD-21937 (KDM) (N.C. Dist. Ct. Mecklenburg Cnty. Dec. 4, 2025) (order re Defendant's/father's motion for Rule 11 sanctions).

[177] *See id.*, at 00:59–14:16 (the Debtor's statements asserting that the Trustee's and the Bankruptcy Administrator's actions were adverse to the Debtor, driven by bias, and extralegal).

the Court's orders.[178] At the conclusion of the September Hearing, the Court took the Recusal

Motion under advisement, which it denied on September 29, 2025.[179]

## 2.  Further Filings

52.    On October 6, 2025, the Debtor filed the First Contempt Review Motion, which

reaffirmed that she had taken the Debtor's Jurist Course.[180] On October 10, 2025, the Trustee and

the Bankruptcy Administrator filed the *Fifth Joint Status Report and Response and Objection to*

*Debtor's Response and Declaration to Order Denying Debtor's Request to Purge Contempt,*

*Further Sanctioning Debtor, and Denying Debtor's Discharge* [Doc. No. 227] (the "Fifth Status

Report"). The Fifth Status Report asserted that (1) the Debtor still had done nothing to comply

with the May through September Tribal Directives and had not fully complied with the May

through September Account Directives because some statements were still outstanding, (2) the

provided statements had revealed more of the Debtor's Accounts, and (3) the Debtor's production

of the CashApp Statements (the "First CashApp Statement Production") were incomplete as it was

a summary missing specifics as to the transfers.[181]

53.    On October 17, 2025, the Debtor filed the *Supplemental Response Providing*

*Additional Information to Fifth Joint Status Report* [Doc. No. 229] (the "Fifth Status Report

Response"). The Fifth Status Report Response asserted that the Debtor was trying to comply with

the May through September Account Directives and that, as it pertained to the CashApp

---

[178] *See id.*, at 14:30–24:55.

[179] *See Order and Opinion Denying Motion for Recusal* [Doc. No. 221].

[180] *See* First Contempt Review Motion, p. 8, ¶ 1.J ("The Court has at times referred to the course I took through my asserted tribe as 'jurisprudence'. To clarify, it is properly described as a tribal jurist course. It is an educational and cultural course, not a degree program, law school coursework, or a credential authorizing the practice of law. I have never represented this tribal course as a law degree, have I ever held myself out as a licensed attorney nor practiced law.").

[181] *See* Fifth Status Report, pp. 3–6.

statements, the Debtor had provided a full unredacted version of the Debtor's CashApp accounts on October 17, 2025 (the "Second CashApp Statement Production").[182] However, the Debtor stated in Fifth Status Report Response that she would not comply with the May through September Tribal Directives.[183]

## G. October Facts

### 1. The October Hearing and the Trustee's Letter and the Debtor's Protective Motion

54.    At a hearing on October 20, 2025 (the "October Hearing"),[184] the Contempt Fines totaled $9,100. After disposing of procedural matters,[185] the Court turned to the status hearing on the contempt matters. For opening arguments, as to the May through September Account Directives, the Debtor asserted that she had finally fully complied by providing all requested available statements in existence.[186] As to the May through September Tribal Directives, the

---

[182] *See* Fifth Status Report Response, ¶¶ I.1–I.3.

[183] *See id.*, ¶ I.5 (the Debtor's statement:

The Debtor respectfully reminds the Court and the Trustee that this matter has already been fully addressed in prior filings. As previously explained, the Debtor does not possess, own, or control the proprietary course materials of the tribal entity. These materials are protected by copyright and trademark and remain the lawful property of the tribe. The Debtor has no legal authority to reproduce or distribute them, and any attempt to do so would risk copyright or trademark infringement.).

Although the Debtor asserted that she had complied specifically July and September Mailing Order to Tribal Entities Directive, *see id.*, ¶ I.4, this assertion was on the basis that she had sent the Contempt Finding Order to parties related to the case, namely, the Trustee, the Bankruptcy Administrator, and the Debtor's Creditors, and not to any Tribal Entity. *See id.*, p. 8.

[184] *See Courtroom Recording on October 20, 2025, at 10:40:53 AM* [Doc. No. 233] (the "First October Hearing Recording") (52 minutes), *Courtroom Recording on October 20, 2025, at 11:43:27 AM* [Doc. No. 234] (the "Second October Hearing Recording") (59 minutes), *Courtroom Recording on October 20, 2025, at 11:52:16 AM* [Doc. No. 235] (the "Third October Hearing Recording") (8 minutes), *Courtroom Recording on October 20, 2025, at 1:21:39 PM* [Doc. No. 236] (the "Fourth October Hearing Recording") (1 hour), & *Courtroom Recording on October 20, 2025, at 1:49:17 PM* [Doc. No. 237] (the "Fifth October Hearing Recording") (27 minutes); *see also* Exhibit List [Doc. No. 232] (the "October Hearing Exhibits").

[185] *See* First October Hearing Recording, at 02:24–28:29 (considering the *First Application for Compensation to: Hamilton Stephens Steele + Martin, PLLC* [Doc. No. 219] (the "October Fee Application"); *id.*, at 28:30–35:11.

[186] *See id.*, at 36:03–47:51.

Debtor asserted that she could not comply by repeating her argument that the requested materials were copyrighted[187] and irrelevant to her bankruptcy case because she never presented herself as a lawyer and they did not contribute to paying her creditors.[188]

55.    The Trustee asserted that the Debtor had satisfied many of the account statement requests in the May through September Account Directives by providing the Second CashApp Statement Production, but that there were still a few potentially necessary outstanding statements.[189] Next, the Bankruptcy Administrator cross-examined the Debtor with a presentation of printouts of statements from the Debtor's accounts, which the Debtor confirmed to be accurate and which contained transfers totaling almost $4,000 to various Tribal Entities.[190] The Bankruptcy Administrator also presented printouts of various pages from the Tribal Entities' websites.[191]

56.    When the Bankruptcy Administrator asked the Debtor about one payment made to a Tribal Entity, the Debtor could remember virtually no details about the transfer or the Tribal

---

[187] *See id.*, at 47:52–48:52 ("Um, when it concerns the, uh, tribal documents, again, um, I've answered this in previous, um, again, I don't, I don't own. I don't possess. I don't control any of these things that the, um, uh, of the tribal entity and again, I understand that the court may have, um, uh, said this, but again, they are copyright and trademarked and remain lawfully to the tribe. I don't have any legal authority over them, and, um, again, that puts me at risk when it concerns copyright and trademark, um, infringement.").

[188] *See id.*, at 48:53–50:31 ("Um, Again, I've, I've stated before, um, that these are educational and cultural programs or really courses, but, um, the, the, fact is that this is not a law school curriculum, it's not a law degree, it's not a degree program, it's not, um, any type of, authorizing the, excuse me, the practice of law. And nor have I presented myself as such in any capacity …. Um, is not benefiting the creditors at all. Um, it should be considered as resolved and not raised in any, um, future reports, and I'm seeking protection from any further sanctions when regards this issue").

[189] *See* Second October Hearing Recording, at 00:00–05:52.

[190] *See* October Hearing Exhibits, Exhibit BA 1, p. 2 (the Debtor's transfer of $650 to HAWAB on January 5, 2022); *id.*, p. 5 (same of $550 on March 8, 2022); *id.*, p. 6 (same of $720 to Shabazz Associates on November 28, 2022); *id.*, p. 8 (the Debtor's transfer of $300 to Xi-Amaru on March 8, 2024); *id.*, p. 11 (the Debtor's transfer of $55 to Aboriginal Medical Association on September 9, 2024); *id.*, p. 13 (the Debtor's transfer of $360 to Xi-Amaru on October 4, 2023); *id.*, p. 16 (the Debtor's transfer of $515 to Xi-Amaru on January 3, 2023); *id.*, p. 20 (the Debtor's transfer of $270 to Aboriginal Medical Association on September 8, 2023) *id.*, p. 24 (the Debtor's transfer of $360 to Aboriginal Medical Association on October 2, 2024); *id.*, p. 28 (the Debtor's transfer of $150 to Aboriginal Medical Association on December 2, 2024).

[191] *See id.*, Exhibits BA 2–11.

Entity.[192] When the Bankruptcy Administrator asked the Debtor about details about the Debtor's

Jurist Course, the Debtor could not recall most details.[193] When the Bankruptcy Administrator

asked the Debtor about (1) her familiarity with certain Tribal Entities' online materials or

individuals, (2) the source of certain arguments made by the Debtor to the North Carolina state

court and to the Court during these proceedings, (3) the origin of certain practices carried out by

the Debtor in her pleadings, and (4) the Tribe's and the Tribal Course's relation to Holt Consulting

and Holt Solutions, the Debtor could not recall virtually any details[194] or pled the Fifth

Amendment.[195] When the Bankruptcy Administrator further pressed the Debtor regarding the

Tribal Course Documents and their format, the Debtor again testified that she could not provide

---

[192] *See* Second October Hearing Recording, at 07:23–13:51 (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor testifies that she could not recall (1) whether she was familiar with or had heard of HAWAB or HAWAB DWF or their websites, (2) why she made the payment of $650 to HAWAB on January 5, 2022, (3) whether her Tribe was located at Dallas Fort Worth, or (4) whether she had taken any courses through HAWAB DWF).

[193] *See id.*, at 13:51–24:06 (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor testifies that she could not recall (1) where she took the Debtor's Jurist Course, (2) who provided the Debtor's Jurist Course, (3) whether someone had threatened consequences if the Debtor provided the Debtor's Tribal Course Documents and who it was, (4) whether someone had told her she could not provide the Debtor's Tribal Course Documents, (5) when she started the Debtor's Jurist Course, (6) whether she showed up to one of classes for the Debtor's Jurist Course or had taken one class this year, or (7) whether the Debtor's Jurist Course was self-paced, online, or in person).

[194] *See id.*, at 24:07–44:51 (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor testifies that she could not recall (1) whether she had seen material on HAWAB's website, (2) whether she knew who the individual was presenting in a YouTube video on HAWAB's website, Minister Kojo, (3) whether she had taken a class with, or spoken to, or had any contact with 'Minister' Kojo, (4) what ARNA's website's statement meant when it offered certification for individuals to protect themselves against adverse legal fiction posing as government structures, (5) how long the Debtor had been signing her filings "all rights reserved," which the Debtor has done for virtually all pleadings to the Court, (6) when her divorce had wrapped up, (7) what else the Debtor signed with "all rights reserved," (8) what the phrase "fraudulent debt" used in one of her pleadings meant, (9) whether she thought the Court was a legal fiction, (10) whether the Debtor was taking any Tribal Courses when she created Holt Consulting, (11) whether the Debtor was a member of the Tribe when she created Holt Consulting, (12) when the Debtor joined the Tribe, (13) whether the Debtor's Jurist course on "nationality" covered tribal businesses, or (14) what the source was for the language describing Holts Solutions as a tribal entity that appeared in the organization filing the Debtor had submitted to the North Carolina Secretary of State).

[195] *See id.* (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor pleads the Fifth Amendment as to from whom and where she learned that tribal properties were tax exempt).

them due to her nonpossession of the Tribal Course Documents.[196] The result was similarly futile

when the Court stated one way the Debtor could display good faith to comply with the Tribal

Directives was to try obtain login credentials for the Debtor's Tribal Courses.[197] The Debtor's

---

[196] *See id.*, at 44:52–46:59 (the Bankruptcy Administrator's and the Debtor's exchange:

Bankruptcy Administrator: First what I don't understand. I hope you can help me. On the one hand, I'm hearing that you're a curious person, a lifelong learner. That you read and you, you search and you look. And you don't really remember taking any classes, correct me if I'm wrong, that you don't really remember taking a class on, to be a jurist, right? You may have signed up that you, you did, if you did, you didn't do it, right? But on the other hand, you will not turn over your coursework because you'll get in trouble. The materials don't belong to you. I don't understand the gap. If you, if you've got materials that you can't turn over because you're going to get in trouble. Because of copyright and trademark. Did you take the class? Did you find them at the library?

Debtor: What are you talking about? You're asking me for stuff that I don't own, that I don't have. I mean, I don't understand, I don't, I really don't understand, and that belong to a tribe that, again, that owns these materials.

Trustee: Where did you get it?

Debtor: So, I don't understand what you want me to do.

Trustee: Where'd you get it? Where'd it come from?

Debtor: I have no idea.

Trustee: You don't know where the stuff came from, that you're being sanctioned a $150 a day. Not to turn over. You didn't bring it with you?

Debtor: How am I going to turn over something that I do not own?

Trustee: But you have it, don't you? You have it.

Debtor: I'm going to turn over something I do not own or, or because I, I don't have any other answer for you.

Trustee: What is it? How many pages? Is it electronic? Is it number?

Debtor: I don't have any answers for you.

Trustee: Why?

Debtor: I don't have any answers for you. I answered. I answered you. You don't like the answer that I gave you. So...).

[197] *See id.*, at 46:51–50:28 (the Bankruptcy Administrator's, the Debtor's, and the Court's exchange:

Court: Ms. Ford, just to correct the record, you've said a lot of different things, so it's not on deaf ears. It's more that you said you have these things that you can't turn them over, but then now you're saying, but I don't actually...

Debtor: Your Honor, I'm not trying to be rude. I'm just saying I can't turn over what I don't own or possess.

Court: But you do have them. That's what we're asking at this point.

Debtor: I don't have, I don't have them. That's why it's like, I don't, I don't know what you want me to do.

Court: So, so you've taken the courses, but you don't have the materials.

Debtor: I don't have the material. I don't, I don't have them, so I don't know what else.

Court: Did you ever have them? What, what can you do about any of this? This is, I mean, again, it doesn't, do you still have access to your courses?

Debtor: I don't have access to anything. That's why I'm, again, I don't own them. I don't have access to them. I don't have them.

Court: And where can you, do you have a login? Do you log into the courses?

inability to recall continued when the Debtor was asked questions about the Tribal Payments and

the Tribal Entities.[198] The Debtor continued pleading the Fifth Amendment.[199] The Trustee cross-

examined the Debtor about the fact that a preliminary comparison of the First and Second CashApp

Statement Productions display that the statements "do not entirely match," and how the Debtor

---

Debtor: I don't even remember.).

[198] *See id.*, at 50:28–59:59, & Third October Hearing Recording, at 00:00–08:15 (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor testifies that she could not recall (1) why or for what she had paid $550 to HAWAB DFW on March 8, 2022, (2) who anyone was whom someone could contact to learn why she had made that payment, (3) whether HAWAB DFW was related to the Tribe, (4) what the Tribe's flag was and whether it matched a flag pictured on HAWAB DFW's website, (5) whether there was more than one ARNA, (6) why or for what the Debtor had paid $720 to Shabazz Associates on November 28, 2022, or whether the payment was for dues or a product or service, (7) whether the Debtor had ever heard of Shabaz Associates, (8) whether the Debtor had disputed that charge or had ever disputed any charge to one of the Debtor's Accounts, (9) whether she had seen the 'Debt Discharge Intake Form' on Shabazz Associates' website, (10) whether the Debtor had sought any advice from a Tribal Entity about debt relief other than bankruptcy); Fourth October Hearing Recording, at 03:58–38:02 (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor testifies that she could not recall (1) whether individuals have to pay dues to be a member of ARNA or the Tribe, (2) whether payment of dues is every other year, (3) when the last time was that the Debtor had paid dues to the Tribe or whether it was in 2025, 2024, or 2023, (4) who would have records of the Debtor paying dues and to whom the Debtor paid or pays dues, (5) for what the Debtor had paid $515 to the Tribe on January 4, 2023, or any details regarding that payment, (6) whether the Debtor had ever heard of Dr. Ali, (7) whether the Debtor had used the Debtor's Tribally Listed Email for tribal business, (8) whether the Debtor's Tribally Listed Email was referencing the Debtor, (9) whether the Debtor was familiar with certain ARNA terms and whether they were to whom certain Tribal Payments had been made, (10) for what the Debtor had paid $270 to the Aboriginal Medical Association on September 8, 2023, or when the last time was that she had bought something from them, (11) for what the Debtor had paid $360 to the Tribe on October 4, 2023, or any details regarding that payment, (12) for what the Debtor had paid $300 to the Tribe on March 8, 2024, or any details regarding that payment, (13) for what the Debtor had paid $25 and $30 to the Aboriginal Medical Association on September 16, 2024, or any details regarding that payment, (14) for what the Debtor had paid $360 to the Aboriginal Medical Association on October 2, 2024, or any details regarding that payment, (15) whether the Debtor had taken any Tribal Courses through the Aboriginal Medical Association, (16) for what the Debtor had paid $150 to the Aboriginal Medical Association on December 2, 2024, or any details regarding that payment, (17) whether the Debtor had ever visited the Aboriginal Medical Association's website or whether the website was how she had made one of the payments to the Aboriginal Medical Association, (18) what the Debtor received for all of the Tribal Payments, (19) whether she had completed homework for a Jurist Course, (20) whether the Debtor had learned anything about a constitutional amendment such as the Fourteenth, Fourth, Fifth, or Sixth, through the Tribe, (21) whether the Debtor had received any private links for any of the Debtor's Tribal Courses or any tribal meetings, or (22) whether the Debtor had seen or received a 'Legal Maestro Manual').

[199] *See* Third October Hearing Recording, at 00:00–08:15 (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor pleads the Fifth Amendment as to whether any of the tribal statuses listed on Shabazz Associates website described the Debtor's tribal status); Fourth October Hearing Recording, at 03:58–38:02 (the Bankruptcy Administrator's and the Debtor's exchange where the Debtor pleads the Fifth Amendment as to whether she had taken any ARNA aboriginal law firm certification classes).

made at least one edit to the two statements adding a confidentiality statement, to which the Debtor could not explain.[200]

57.    In closing arguments, the Bankruptcy Administrator argued at to the Accounts Directives, although the Debtor had finally submitted all requested account statements, since some statements were redacted, the Debtor had not sufficiently complied with that directive.[201] The Bankruptcy Administrator requested the Court sanction the Debtor pursuant to Federal Rule of Bankruptcy Procedure 9011 for continuing to assert she had complied with the prior Contempt Orders while openly acknowledging she had not complied with certain directives.[202] Next, the Bankruptcy Administrator argued that the Contempt Fines appeared to not be working to obtain compliance as to the May through September Tribal Directives and recommended the Court consider incarceration of the Debtor especially given the Debtor's unpersuasive and non-remembering testimony which was inconsistent with the Debtor's prior submissions to the Court.[203] Finally, the Bankruptcy Administrator requested the Court deny the Debtor any discharge with prejudice.[204] The Trustee joined the Bankruptcy Administrator's arguments and added that "it's abundantly clear that compliance has not occurred" and that "that the sanctions today have not had the impact that the parties would have otherwise hoped they would have."[205] The Debtor then closed, first asserting she had done all she could to comply with the May through September Account Directives,[206] then that she could not comply with the May through September Tribal

---

[200] *See id.*, at 38:01–45:09.
[201] *See id.*, at 59:23–59:59 & Fifth October Hearing Recording, 00:00–08:27.
[202] See id.
[203] See id.
[204] *See id.* (the Bankruptcy Administrator's statement that her office was required to initiate an adversary proceeding requesting denial of discharge within a year of a debtor filing a petition, and would do so if these matters continued past December 23, 2025)
[205] *See* Fifth October Hearing Recording, at 08:29–10:28.
[206] *See id.*, at 10:40–18:57.

Directives because she did not possess the Tribal Course Documents or have the authority to provide them.[207]

58.     Finally, the Court directed the Debtor to provide unredacted versions of all account statements.[208] The Court repeated that the Debtor had to comply with the September Mailing Order Directive and clarified that serving specifically HAWAB DFW, Shabazz Associates, the Tribe, Aboriginal Medical Associates (the "October Mailing Order Directive," together with the July and September Mailing Order to Tribal Entities Directive, the "July through October Mailing Order to Tribal Entities Directive").[209] As to the Course Documents Directives, the Court suggested that the Debtor show good faith attempts to comply by providing to the Trustee and the Bankruptcy Administrator the Debtor's login credentials for all Tribal Course related websites, or if the Debtor did not remember the login credentials, by resetting the login credentials and providing reset login credentials to the Trustee and the Bankruptcy Administrator (the "October Login Credentials Directive").[210] The Court then indicated to the Parties that the Court no longer thought the Debtor's civil contempt sanctions were coercive and that the Court would consider next pursuing other penalties.[211] Finally, the Court urged the Debtor to speak to a lawyer regarding the impending possibility of criminal sanctions against the Debtor.[212] Given the Debtor's submissions to the Court, the Court wanted to provide the Debtor an opportunity to show some good faith attempt at

---

[207] *See id.* ("The tribal stuff, again, has nothing to do and please, please understand that I respect the court. It's not that. Again, I can't give you what I don't have. And regardless, and in addition to the fact, again, it's not mine. So, I don't know how I'm going to be able to do that.")
[208] *See id.*, at 19:01–24:36
[209] *See id.* ("[T]he requirement addresses your claim that you can't provide tribal documents for fear by suit. This is to help you. Serving the tribe makes clear that your compliance is court ordered and beyond control. It allows the tribe to appear and object, rather than for you to assert the rights.")
[210] See id.
[211] See id.
[212] See id.

compliance,[213] and the Court continued all outstanding matters for hearing November 3, 2025 (the "November 3 Hearing").[214]

### 2. The Debtor's Further Filings, the Protective Motion, the Denial of Reference Withdrawal, and the Denying Shortened Notice Order

59.    On October 27, 2025, the Debtor filed the Second Contempt Review Motion and the *Motion to Limit Trustee's Examination Under Rule 2004 and for Protective Order Regarding Post-Petition Personal Expenditures* [Doc. No. 243] (the "Protective Motion"). The fact section of the Protective Motion acknowledged payments by the Debtor to the Tribe for coursework for the Debtor's Courses (the "Protected Motion's Payments"),[215] and stated that "Trustee ha[d] indicated an intent to question or investigate these transactions to determine whether the Debtor

---

[213] *See id.*, at 24:36–27:28 (the Debtor's and the Court's exchange:
Debtor: Question. If I don't have logins, if I don't have any of those. What do I do?
Court: There are many ways. You must produce everything that you took from February to May to [the Bankruptcy Administrator] or [the Trustee] in some capacity.
Debtor: And if I don't have, if I don't have any of it, if I have none of that, then would produce any and all documentation related to those courses.
Court: So, you don't have it, you didn't have a prior login?
Debtor: If I don't have none of that. If I've never received any of these things, then what?
Court: Produce any emails related to what you've taken, your certificates you've said you've had.
Debtor: And if I have, again, um.
Court: Ms. Ford, the issue is you've told us on the record that you've obtained certificates. You've paid money. We need documents related to that.
Debtor: When I stated that, I was mistaken. With, with the certificate. So, I don't, again, I don't have those. So, I was like, oh, well, I thought I did, but I don't. So, again, what, so why don't you start here?
Court: If you want to show good faith to the court. Start here. If you are saying you don't have login and passwords, you have testified previously that you paid in advance for these courses. You, you can show us emails showing your registration. You can show us emails related to the payments you've made for such registration. You can show us any documents you have about how many courses you've taken. I know you've taken a couple to completion and some not to completion. So why don't you start to show your good faith with emails of your registration. Certainly, you must have those.).
[214] *See id.*, at 27:28–27:41.
[215] Protective Motion, ¶¶ I.1–I.6 (stating that the Debtor "ha[d] engaged in ordinary personal, cultural, and educational activities, including" making a "modest donation" and "[p]ayments of membership dues" to the Tribe, as well the "[p]urchase of an educational coursework").

'received value for services'."[216] Also on October 27, 2025, the District Court denied the Debtor's

Reference Withdrawal Motion.[217]

60.      On October 30, 2025, the Debtor filed the Third and the Fourth Contempt Review

Motions which she requested be set for hearing at the November 3 Hearing.[218] Because a three-

day period contravened this Court's Local Rule 9013 requirement for at least fourteen days for

nonmovants to review a motion before the motion is heard, the Debtor moved for the Court to

allow a shortened period because "cause" existed for allowing such under Federal Rule of

Bankruptcy Procedure 9006(c).[219] This cause rested on (1) the constitutional and factual arguments

against the Contempt Order made in the Third and the Fourth Contempt Review Motions, (2) the

ongoing Fines, and (3) the possibility of imprisonment.[220] The next day, on October 31, 2025, the

Trustee objected to shortened notice on the basis that one business day would not afford time

necessary for her to review the new arguments made in the Third and the Fourth Contempt Review

Motions.[221] The Court denied shortened notice.[222]

---

[216] *Id.*, ¶ I.7.

[217] *See ORDER denying 1 Motion to Withdraw Reference; terminating as moot 15 Motion for Leave to Supplement the Record* [Doc. No. 240] (holding that (1) the matters for which the Debtor to withdraw reference were core to bankruptcy, (2) it was efficient for those matters to remain in bankruptcy court, (3) the Debtor's bias and misconduct allegations against the Trustee and the Bankruptcy Administrator were without merit, and (4) the Debtor's constitutional arguments were without merit).

[218] *See* Third Contempt Review Motion, 8; and Fourth Contempt Review Motion, 7; *see also Notice of Hearing* [Doc. No. 249]; *Notice of Hearing* [Doc. No. 250].

[219] *See Motion to Shorten Notice* [Doc. No. 251] (the "First Shorten Notice Motion"); *Motion to Shorten Notice* [Doc. No. 253] (the "Second Shorten Notice Motion," and together with the First Shorten Notice Motion, the "Shorten Notice Motions").

[220] *See* Shorten Notice Motions ¶¶ I.1–5 & ¶ II.

[221] *See Objection of Trustee to Debtor's Motion to Shorten Notice for Hearing on Motion to Vacate Contempt Order and for Declaratory Relief that the Court Exceeded its Article I Authority*, ¶ 2–3 [Doc. No. 256]; *Objection of the Trustee to Debtor's Motion to Shorten Notice and Request Expedited Hearing on Motion to Vacate or Deny Contempt Order and Sanctions for Lack of Evidentiary Basis and Violation of Federal Rules of Evidence and Due Process*, ¶ 2–3 [Doc. No. 257].

[222] *See* Denying Shortened Notice Order.

61.     Also on October 31, 2025, the Trustee filed the *Sixth Status Report on Debtor's Compliance with Orders* [Doc. No. 259] (the "Sixth Status Report"). The Sixth Status Report stated that the Trustee had confirmed the discrepancies between Second CashApp Account Production and the First CashApp Account Production, namely, that transfers had been missing from the first production, many of which, "[d]isturbingly, … involve parties the Debtor has previously attempted to shield from disclosure in this case," i.e., Tribal Entities.[223]

## H.  November Facts

### 1.  The November 3 Hearing, The Trustee's Letter, and the Final Contempt Order

62.     At the November 3 Hearing,[224] the Court considered the Protective Motion[225] and held a status hearing on the contempt matters. By then, the Contempt Fines totaled $11,200. On the Protective Motion, the Debtor argued that the Trustee could not investigate the Protected Motion's Payments as they involved information that was "protected" and irrelevant to bankruptcy.[226]

63.     In rebuttal, the Trustee reminded the Court that at the October Hearing, the Debtor had insisted that she did not know the Aboriginal Medical Association and Dr. Ali.[227] The Trustee demonstrated through independent research, she had concluded that the Dr. Ali operated under the

---

[223] Sixth Status Report ¶ 12–13. The Sixth Status Report reported that the Trustee had concluded that the nonexistence of various accounts statements that the Debtor had been directed to provide by the September Account Directive, thus the Debtor complied with the directive related to those accounts. *See id.,* ¶ 14–20.
[224] *See Courtroom Recording on November 3, 2025, at 11:58:19 AM* [Doc. No. 267] (the "First November 3 Hearing Recording") (52 minutes) & *Courtroom Recording on November 3, 2025, at 12:15:22 AM* [Doc. No. 268] (the "Second November 3 Hearing Recording") (4 minutes); *see also Exhibit List* [Doc. No. 262].
[225] The Protective Motion being heard at the November 3 Hearing, which the Debtor requested, *see* Protective Motion, p. 5, also contravened the Court's local rule for the allowed notice period prior to hearing, *see supra* ¶ 60, but the Trustee moved on October 29, 2025, for the Court to allow a reduced period soley for the Protective Motion, *see* Ex Parte *Motion to Shorten Notice* [Doc. No. 246], which the Court granted. *See Order Granting Motion to Shorten Notice* [Doc. No. 247].
[226] *See* First November 3 Hearing Recording, at 4:52–9:42.
[227] *See id.*, at 12:10–15:52.

Aboriginal Medical Association's name and was the direct recipient of more than $2,000 of the

Tribal Payments.[228] Based on this conclusion, on October 23, 2025, the Trustee sent a letter to both

Aboriginal Medical Association and Dr. Ali related to those transfers made to Aboriginal Medical

Association within the preference period and inquiring whether the Debtor had received value for

the payments (the "Trustee's Letter").[229] A trustee sending such a inquiries, i.e., to a transferee of

a debtor inquiring about the transfer's value exchange, is part and parcel of their duties under 11

U.S. Code §§ 547–548.

64.    The Trustee also noted she did not send a copy of the letter to the Debtor, which is

also standard practice for such inquiries. Still, four days later, the Debtor filed her Protective

Motion using the exact "value" language present in the Trustee's Letter.[230] When the Court asked

the Debtor about the timing and language tying the Protective Motion and the Trustee's Letter, the

Debtor insisted she had not been aware of the letter and that the motion was filed in response to

the previous facts of the case.[231] The Court denied the Protective Motion.[232]

65.    As to the May through September Account Directives, the Trustee discussed the

discrepancies between the First and the Second CashApp Account Productions and the possibility

of spoilation by the Debtor.[233] Notwithstanding that issue, the Trustee stated that the Debtor now

appeared to have fully complied with the May through September Account Directives, as she had

finally sent to the Trustee and Bankruptcy Administrator all requested statements for all accounts

---

[228] *See id.*, at 15:52–19:11.
[229] *See id.*
[230] *See id.*
[231] *See id.*, at 21:21–23:13.
[232] *See id.*, at 23:17–23:39. A written order denying the Protected Motion was entered November 7, 2025. *See Order Denying Debtor's Motion to Limit Trustee's Examination Under Rule 2004 and for Protective Order Regarding Post-Petition Personal Expenditures* [Doc. No. 287].
[233] *See* First November 3 Hearing Recording, at 24:13–29:04.; *see also supra* ¶ 61 (discussing of the Sixth Status Report canvassing the same).

identified as belonging to the Debtor on the Petition Date, which totaled twenty-five.[234] As to the
May through September Courses Documents Directives, the Trustee noted how the Debtor had
taken no actions to comply.[235] The Bankruptcy Administrator concurred with the Trustee's
statements as to the Debtor's compliance with the May through September Account Directives and
the possible spoliation, for which she quoted 18 U.S. Code § 1519 which criminalizes such
conduct.[236] The Bankruptcy Administrator added that the Debtor had not fully complied with the
July through October Mailing Order to Tribal Entities Directive because the Debtor's certificate
of service (the "Certificate of Service") was only to one Tribal Entity, ARNA, and had used a
different address than the one the Trustee and Bankruptcy Administrator had found connected to
ARNA.[237] The Bankruptcy Administrator also noted that the Debtor had done nothing to comply
with the October Login Credentials Directive.[238] The Bankruptcy Administrator concluded by
again recommending that the Court consider referring the Debtor for criminal contempt.[239]

    66.    The Debtor first insisted she had not manipulated any of the CashApp statements
and just provided the statement CashApp had sent to her and which she assumed was correct.[240]
She asserted that the Certificate of Service constituted compliance with July through October
Mailing Order to Tribal Entities Directive.[241] Finally, the Debtor argued that she had made a good
faith effort to comply with the October Login Credentials Directive, by presenting a printout that
purportedly showed:

- (1) an email sent by the Debtor's email on October 26, 2025, to HAWAB Region 6, at
  hawabregion6@gmail.com, stating that the Debtor was "in a bankruptcy court

---

[234] *See* First November 3 Hearing Recording, at 29:04–30:07.
[235] *See id.*, at 30:07–30:23.
[236] *See id.*, at 30:28–36:55.
[237] See id.
[238] See id.
[239] See id.
[240] *See id.*, at 36:57–43:27.
[241] See id.

proceeding and the court has requested that [she] provide the tribal jurist course login," and asking if they "[c]ould provide [her] login to give to them;"

- (2) a response to the email above received by the Debtor's email on October 29, 2025, stating that "[a]ccording [t]o our records[,] [the Debtor] never received or registered for our organization's classes or tribal course login" and "have no login information for us to provide;" and

- (3) an email identical to and sent on the same day as the email above to an entity at amaruxiali@gmail.com (collectively, the "Debtor's Emails").[242]

When the Court asked about the Debtor's Emails and whether the HAWAB Region 6 was the entity from whom the Debtor took the Debtor's Tribal Courses, the Debtor replied she could not recall but would infer HAWAB Region 6 was not since they did not have the login credential.[243] As to the second of the Debtor's Emails, the Debtor asserted she received no response.[244]

67.     The Bankruptcy Administrator rebutted that the Certificate of Service and Debtor's Emails did not show attempts by the Debtor to contact Shabazz Associates, who she believed provided the Debtor's Tribal Courses, or Aboriginal Medical Association, wherefore she had not complied with the July through October Mailing Order to Tribal Entities Directive or the October Login Credentials Directive.[245] The Trustee concurred with the Bankruptcy Administrator and noted that the Protective Motion reaffirmed that the Debtor did take the Tribal Courses which further indicated that the Debtor was willfully not complying with the May through September Courses Documents Directives.[246] The Debtor responded that "it's impossible for [her] to turn over something that [she] do[es]n't have," wherefore, she was "being punished for something that [she] cannot do."[247]

---

[242] *See id.* The court docketed the Debtor's Emails at *Debtors Exhibit(s) 1 and 2* [Doc. N. 261].
[243] *See* First November 3 Hearing Recording, at 43:27–44:39.
[244] *See id.*, at 44:42–45:40.
[245] *See id.*, at 45:53–46:53.
[246] *See id.*, at 46:54–47:23.
[247] *See id.*, at 47:24–50:39.

68.     At the end of the hearing the Court made a final oral order[248] which the Final
Contempt Order rendered in written form.[249] The Final Contempt Order found that, as of the
November 3 Hearing, the Debtor had not fully complied with the Accounts Directives, the Course
Documents Directives, and the Mailing Order Directives.[250] The Final Contempt Order set the
Debtor's Outstanding Motions as well as all outstanding contempt related matters for a final
hearing on November 17, 2025 (the "November 17 Hearing").[251] The Final Contempt Order
directed the Debtor to, by the November 17 Hearing, complete four discrete actions, specifically:

- (1) to forward all emails she had received from CashApp to the Trustee and the
  Bankruptcy Administrator, whose metadata the Trustee and the Bankruptcy
  Administrator were to check (the "Forwarding CashApp Emails Directive," which
  together with the May through September Account Directives, the "non-Tribal
  Directive");[252]
- (2) to mail the Contempt Orders to (a) Shabazz Associates, (b) HAWAB DFW, (c) Xi-
  Amaru Tribe, also known as ARNA, (d) the Aboriginal Medical Association, and (e)
  Dr. Ali (the "November Mailing Order Directive," and together with the July through
  October Mailing Order to Tribal Entities Directive, the "Mailing Contempt Orders
  Directives");[253]
- (3) to email the same five Tribal Entities above, requesting all materials from the
  Debtor's Courses, and to forward those emails and all responses to the Trustee and the
  Bankruptcy Administrator (the "Emailing Tribal Entities and Forwarding
  Directive");[254]
- (4) to forward to the Trustee and the Bankruptcy Administrator any and all emails in
  her email account related to the Debtor's Courses (the "Forwarding All Tribal Emails
  Directive;" which, together with the November Mailing Order Directive and the
  Emailing Tribal Entities and Forwarding Directive, the "November Tribal Directives,"
  which, together with the Forwarding CashApp Emails Directive, the "Final
  Directives," and which, together with the May through September Tribal Directives,
  the "Tribal Directives").[255]

---

[248] *See* Second November 3 Hearing Recording, at 00:07–03:12 (the "Final Oral Order").
[249] The Final Contempt Order did so "to dispel any possibility of the Debtor's claiming confusion." *See*
Final Contempt Order, p. 2 n. 3.
[250] *See* Final Contempt Order, p. 2.
[251] *See id.*
[252] *See id.*
[253] *See id.*, p. 3.
[254] *See id.*
[255] *See id.*, p. 3–4 (stating that this "include[s], but are not limited to, account registration confirmation or
maintenance details of the same, receipts for the purchases and donations that the Debtor has averred she

The Final Contempt Order concluded if by the November 17, 2025, the Debtor had not complied

with the Final Directives, it would consider "criminal contempt, perjury, and potentially

falsification of documents."[256]

69.     Later the same day of the November 3 Hearing, the Debtor filed the Notice

Reconsideration Motion. On November 7, 2025, the Trustee filed the Seventh Status Report, as

well as responses to Third and Fourth Contempt Review Motions,[257] and the Bankruptcy

Administrator filed a response to the Fourth Contempt Review Motions.[258] On November 12,

2025, the Debtor filed replies to the Trustee's responses,[259] a response to the Seventh Status

Report,[260] and the Fifth and Sixth Contempt Review Motions.[261] On November 14, 2025, the

---

made, membership documentation for which the Debtor has averred she paid dues, any course information (including, but not limited to, the "Jurist" course) ranging from scheduling matters such as calendar invitations and meeting links for classes or office hours, to actual course content such as syllabi, reading lists, study materials (including links to or attachments of PDFs, slide decks, audio/video files, or zipped archives), assignments, quiz or test notifications and grading or feedback").

[256] *See id.*, p. 3.

[257] *See Objection of Trustee to Debtor's Motion to Vacate or Deny Contempt Order and Sanctions for Lack of Evidentiary Basis and Violation of Federal Rules of Evidence and Due Process* [Doc No. 276]; *Objection of Trustee to Debtor's Motion to Vacate Contempt Order and for Declaratory Relief that the Court Exceeded its Article I Authority* [Doc No. 277].

[258] *See Objection to Other Document* [Doc. No. 279].

[259] *See Debtor's Reply to Trustee's Objection to Motion to Vacate Contempt Order and For Declaratory Relief that the Court Exceeds its Article I Authority* [Doc No. 290]; *Debtor's Reply to Trustee's Objection to Debtor's Motion to Vacate or Deny Contempt and Sanctions for Lack of Evidentiary Basis and Violation of Due Process* [Doc No. 291].

[260] *See Response to Trustee's Seventh Status Report* [Doc No. 292].

[261] The Debtor moved for the Court to allow a shortened notice period for the Fifth and Sixth Contempt Review Motions in order that they be heard at the November 17 Hearing. *See Motion to Shorten Notice and Expedite Hearing on Motion with Notice of Hearing* [Doc No. 294] (the "Third Shorten Notice Motion"); *Motion to Shorten Notice and Expedite Hearing on Motion with Notice of Hearing* [Doc No. 296] (the "Fourth Shorten Notice Motion"). The Debtor moved on the grounds that the Fifth and Sixth Contempt Review Motions "involves urgent constitutional and procedural matters," that "[d]elay [ ] would risk irreparable harm and render appellate rights ineffective should the Order remain in force through the normal notice period," and that "[e]xpedited review will not prejudice the Trustee or other parties in interest, who will receive prompt service of [these] Motion[s] and the Underlying Motion[s]," which "will preserve the status quo and allow orderly judicial review." *See id.* Although the Court first rejected the Debtor's arguments that requiring the required notice period would affect the Debtor's rights to appeal and that allowing a shortened period would not prejudice the Trustee and the Bankruptcy Administrator, the Court nevertheless granted shortened notice for the Fifth and Sixth Contempt Review Motions for two reasons, namely, (1) because those motions reiterated previous arguments made by the Debtor, and (2) in order to

Bankruptcy Administrator filed limited replies to one of Debtor's replies to the Trustee's responses

and to the Debtor's response to the Seventh Status Report;[262] she additionally filed responses to

the Fifth and Sixth Contempt Review Motions,[263] to which the Trustee joined.[264]

### 2. The November 17 Hearing

70.    At the November 17 Hearing,[265] the Court heard the Debtor's Outstanding Motions

and held a final status hearing on the Contempt Orders. First, the Debtor presented the Contempt

Review Motions.[266] The Debtor invoked her Fifth Amendment rights at the beginning of the

hearing.[267] The Debtor argued that the Contempt Orders violated her rights under First, Third,

Fourth, Fifth, Ninth, and Fourteenth Amendment, as well Fed. R.s Bankr. P. 9018, 9023, and 9024,

because the Contempt Orders were "overboard," sought disclosure of "expressive and social

materials," constituted an "invasion of confidential and private matters," and were irrelevant to

bankruptcy.[268]

71.    The Bankruptcy Administrator, with joinder from the Trustee, rebutted that these

arguments (1) were not timely, (2) did not accurately represent the law, and (3) failed to provide

---

allow final hearing on all matters at the November 17 Hearing. *See Order Granting Motion to Shorten Notice* [Doc No. 297].

[262] *See Limited Response Pursuant to Bankruptcy Rule 9011 to Debtor's Filing at ECF No. 290* [Doc No. 298]; *Limited Response Pursuant to Bankruptcy Rule 9011 to Debtor's Filing at ECF No. 292* [Doc No. 299].

[263] *See Objection to Other Document* [Doc No. 300]; *Objection to Other Document* [Doc No. 301].

[264] *See Trustee's Objection and Joinder to the Bankruptcy Administrator's (I) Objection to Debtor's Motion for Reconsideration, Protective Relief, and Emergency Stay Pending Appeal and (II) Objection to Debtor's Motion for Reconsideration, Protective Relief, and Stay Pending Appeal* [Doc No. 300].

[265] *See Courtroom Recording on Nov. 17, 2025, at 11:58:19 AM* [Doc. No. 303] (the "First November 17 Hearing Recording") (15 minutes), *Courtroom Recording on Nov. 17, 2025, at 12:15:22 AM* [Doc. No. 304] (the "Second November 17 Hearing Recording") (59 minutes), & *Courtroom Recording on Nov. 17, 2025, at 12:15:22 AM* [Doc. No. 305] (the "Third November 17 Hearing Recording") (24 minutes).

[266] *See* First November 17 Hearing Recording, at 04:00–10:42.

[267] *See id.*

[268] *See id.*

sufficient injury justifying the relief sought of reconsideration and stay pending appeal, to which

the Trustee joined.[269] The Debtor rebutted that her *pro se* status warranted excepting the timeliness

issue and that she had shown constitutional violations and injury warranting the Debtor's requested

.[270]

72.    The Court took the Debtor's Outstanding Motions under advisement and turned to

the status hearing.[271] The Trustee presented how the Debtor had done nothing to comply with the

November Mailing Contempt Orders Directive, the Email Tribal Entities and Forward Directive,

and the Forwarding All Tribal Emails Directive.[272] The Trustee asserted that the Debtor had

complied with the Forwarding CashApp Emails Directive and that although the First CashApp

Account Production's missing transfers were "[i]ncredibly odd," "nothing … looked concerning

with the metadata" and it "appears to be legitimate."[273]

73.    The Debtor responded that she had indeed just sent the CashApp statements as they

were sent to her and any discrepancies were CashApp's fault, reinvoked the Fifth Amendment, and

repeated her arguments that (1) the contempt proceedings violated the Eighth, Fourteenth and

Ninth Amendments and this Court's Article Authority and (2) she had complied with the Contempt

Orders because she done fully complied with the non-Tribal Directives and the Tribal Directives

violated the First Amendment, were irrelevant to bankruptcy.[274] The Bankruptcy Administrator

mentioned that the Debtor previously asserted being a member of a federally recognized tribe.[275]

---

[269] *See id.*, at 10:47–12:38.
[270] *See* Second November 17 Hearing Recording, at 00:32–11:26.
[271] *Id.*, at 30:29–35:54
[272] See id.
[273] See id.
[274] *See id.*, at 36:59–46:03.
[275] *See id.*, at 46:13–57:32.

74.    The Debtor challenged that she had ever asserted to belong to a federally recognized Tribe.[276] The Court then pulled up the Debtor's *Response / Debtor's Reply to 277 Trustee's Objection to Motion to Vacate Contempt Order and For Declaratory Relief that the Court Exceeds its Article I Authority* [Doc. No. 290] and quoted the Debtor's passage making such assertion.[277]

75.    In support of her Third and Fourth Contempt Review Motions, the Debtor repeated her arguments that the Contempt Orders had violated copyright, involved matters irrelevant to bankruptcy, and sought to punish the Debtor using civil contempt, as grounds for the Court having exceeded its Article I authority, not followed evidentiary rules, and violated due process.[278]

76.    As to her Notice Reconsideration Motion, the Debtor argued that the Denying Shortened Notice Order violated due process because she was facing the threat of incarceration and did not have the staff that the Trustee and the Bankruptcy Administrator have.[279]

77.    The Trustee rebutted that the Notice Reconsideration Motion was not timely.[280] As to the Contempt Review Motions, the Trustee asserted that they were not timely or warranting the reconsideration relief because the Debtor could not demonstrate the threshold requirement of a meritorious argument. Instead, the Debtor moved based on her prior arguments of copyright and relevancy, which were "well plowed ground in this case." [281] The Court concluded the November 17 Hearing by taking the matters under advisement.[282] The Court now renders its opinion.

---

[276] *See id.*, at 57:39–59:59; Third November 17 Hearing Recording, at 00:00–02:00.

[277] *See* Third November 17 Hearing Recording, at 00:00–02:00.

[278] *See id.*, at 05:03–13:09.

[279] *See id.*, at 13:57–16:12.

[280] *See id.*, at 20:07–20:42.

[281] *See id.*, at 20:42–23:27.

[282] *See id.*, at 23:30–23:49.

## II.    DISCUSSION

### A.  Civil Contempt: The Contempt Findings, the Contempt Fines, the Debtor's Impossibility Argument, and the Debtor's Outstanding Motions

#### 1.  Legal Background

78.    Federal bankruptcy courts have the power (1) to find a party in civil contempt (the "contemnor") based on a contemnor's (a) noncompliance with an order from the court (the "underlying order") and (b) knowledge or constructive knowledge of the underlying order and their noncompliance, and well as the power (2) to implement various sanctions, ranging from monetary fines to incarceration, against the contemnor in order to coerce compliance. *See* Fed. R. Civ. P. 70(e) (empowering federal district courts to "hold [a] disobedient party in contempt") & Fed. R. Bankr. P. 7070 (incorporating Federal Rule of Civil Procedure 70(e) to bankruptcy courts "in an adversary proceeding"); *see also Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 267 (4th Cir. 2019) (noting that federal district courts at least retain "the inherent power to order sanctions to preserve the integrity of the judicial process and to punish bad-faith conduct intended to delay or disrupt the course of litigation or to impede enforcement of a court order" (citation omitted)); *Allen v. Pierce (In re Timmer)*, No. BAP AZ-04-1604-KMOS, 2005 WL 6960235, at *4 (B.A.P. 9th Cir. Sept. 29, 2005) (noting that both federal district courts and bankruptcy courts "have inherent power to regulate practice in cases before them" and "deal with abuses in practice under its inherent power" (citation omitted)); *United States v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017) ("[Civil contempt requires] (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's 'favor'; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result" (citations omitted).); *Beckhart v. Newrez LLC*, 31 F.4th 274, 278 (4th Cir. 2022) (civil contempt,

unlike criminal contempt, generally does not require willfulness to violate an order ((citations omitted))); *Sugar v. Burnett*, 130 F.4th 358, 377–78 (4th Cir. 2025) (same).

79. However, federal bankruptcy courts' civil contempt power is also limited. Civil contempt sanctions can only be compensatory or coercive, not punitive. *See Buffington v. Balt. Cnty.*, 913 F.2d 113, 133-34 (4th Cir. 1990) (noting that civil contempt, unlike criminal contempt, requires that contemnors' sanctions " 'stand[ ] [ ] unless and until [they] perform[ ] the affirmative act required by the court's order'," (citation omitted)). Punitive sanctions may only arise from criminal contempt, which requires "criminal proceedings, including the right to jury trial." *See United Mine Workers of America v. Bagwell, Syllabus*, 512 U.S. 821 (1994).

80. A contemnor facing coercive civil contempt sanctions may purge the civil contempt finding and end continued sanctions by the contemnor sufficiently complying with the underlying order. The Fourth Circuit does not necessarily require compliance to be "perfect," and allows "substantial" compliance to purge. *See, e.g., United States v. Darwin Constr. Co.*, 873 F.2d 750, 754 (4th Cir. 1989); *De Simone v. VSL Pharm., Inc.*, 36 F.4th 518, 530 (4th Cir. 2022) (citing *id.*, at 754 & 755); *Consolidation Coal Co. v. United Mineworkers of Am.*, 683 F.2d 827, 832 (4th Cir. 1982). Still, substantial compliance requires the contemnor to take "all reasonable steps … to ensure compliance" as to each part of an underlying order. *See Darwin*, 873 F.2d at 755–56. Thus, substantial compliance cannot exist where (1) regardless of what steps the contemnor has taken, any other available steps were not taken, or (2) regardless of what steps are still available, the contemnor appears to only have taken steps as to certain parts of an underlying order. *See id*.

81. However, civil contempt may end without the contemnor fully or even substantially complying in two ways. The first way is if civil contempt sanctions begin as coercive but become punitive over time. When it becomes sufficiently apparent to a court that the sanctions will not

coerce the compliance, the court must terminate the civil contempt or convert it to criminal contempt to ensure the appropriate due process procedural requirements for criminal proceedings occur. *See Soobzokov v. CBS, Quadrangle/New York Times Book Co.*, 642 F.2d 28, 31 (2d Cir. 1981) ("When it becomes obvious that sanctions are not going to compel compliance, they lose their remedial characteristics and take on more of the nature of punishment."); *Simkin v. United States*, 715 F.2d 34 (2d Cir. 1983) ("[A]t some point in what otherwise would be an indefinite period of confinement[,] due process considerations oblige a court to release a contemnor from civil contempt if the contemnor has then shown that there is no substantial likelihood that continued confinement will accomplish its coercive purpose" (citations omitted).).

82.     The second way to end civil contempt in the absence of compliance is "where compliance is impossible" (the "impossibility defense"). *See United States v. Rylander*, 460 U.S. 752, 757 (1983); *see also Shillitani v. United States*, 384 U.S. 364, (1966). Although the initial burden for civil contempt is on the movant, *see Ali*, 874 F.3d at 832, once the movant has shown the required elements, the contemnor bears the burden of proving an impossibility defense. *See id.* (citations omitted). The impossibility defense is also limited in certain ways key to this case, as the Court discusses below.

## 2.  Analysis

### a.  The Debtor's Outstanding Civil Contempt

#### i.   The Debtor's Asserted Impossibility Defense

83.     Throughout these proceedings, the Debtor claimed that she cannot comply with the Tribal Directives because she deems those directives violative of copyright and irrelevant to her bankruptcy case. The Debtor appears to have first argued this (1) in the First Status Report

Response back in early July.[283] The Debtor continued to argued this (2) directly before the Court at the July 21 Hearing,[284] in August (3)–(5) in the Debtor's First, Second, and Third Statements of Full Compliance,[285] in September (6) directly before the Court at the September Hearing during the status hearing[286] and (7) during consideration of the Recusal Motion,[287] in October (8) in the First Contempt Review Motion,[288] (9) in the Fifth Status Report Response,[289] and (10) at the October Hearing,[290] and in November (11) at the November 17 Hearing.[291] Such arguments, obviously, would not suffice as grounds for the impossibility defense.

84.    Starting at the October Hearing, the Debtor raised a purportedly different argument, specifically, that she cannot comply with the Tribal Directives because she (1) does not have access to any Course Documents and (2) has no ability to obtain access to any such Course Documents to provide to the Trustee and the Bankruptcy Administrator (the "Debtor's New Argument").[292] If true, the Debtor's New Argument would most likely suffice for an impossibility defense. However, the Court rejects the Debtor's New Argument for five distinct reasons.

85.    First, the Debtor's New Argument does not really seem to be 'new'. Rather the Debtor's assertion of her nonpossession or control of the Course Documents was her own conclusion based on her perennial copyright and relevancy arguments.[293] While not explicitly a

---

[283] *See supra* ¶ 29.
[284] *See supra* ¶ 37.
[285] *See supra* ¶¶ 40 & 42.
[286] *See supra* note 156 and accompanying text.
[287] *See supra* note 170 and accompanying text.
[288] *See supra* note 180 and accompanying text.
[289] *See supra* note 183 and accompanying text.
[290] *See supra* notes 187–188 and accompanying text.
[291] *See supra* note 278 and accompanying text.
[292] *See supra* note 199–200 and accompanying text. The Court notes that the Course Documents have not been sought for public dissemination, which the Debtor has alleged, but for review by the Trustee and the Bankruptcy Administrator.
[293] *See, e.g., Affidavit of Impossibility and Good Faith Compliance Introduction*, ¶¶ 2.8–2.11 & ¶¶ 4.12–4.13 [Doc. No. 244] (explaining (1) the Debtor's noncompliance with the Course Documents Directive on the grounds that the Debtor "d[id] not have possession, custody, or control over these materials," and "no

function of her asserted copyright argument, the Debtor appears to just be reasserting that legal conclusion in an attempt to make the assertion one of fact alone.

86.     Second, and more crucially, absent changed circumstances, a contemnor may not raise for the first time at the contempt proceeding stage arguments as to why they cannot comply with the underlying order. *See Rylander*, 460 U.S. at 757 (holding that a contemnor "may not [ ] raise[ ] for the first time in a contempt proceeding" for noncompliance with a production order "that [they] lacked possession or control of the records at the time the order was issued, [but] could defend the contempt charge on the ground that [they] w[ere] then unable to comply because [they] lacked possession or control" (citations omitted)); *see also Ali*, 874 F.3d at 830 (holding that because the contemnor "did not raise her nonpossession defense at the enforcement stage" as to a request for production of documents, she "was therefore precluded from raising that defense at the contempt stage" as to the request). This is exactly what the Debtor attempted to do with the Debtor's New Argument. If some factual impossibility did exist, the Debtor was required to argue this during the Court's consideration of these contempt matters for the May or June Orders, or, at the least, prior to the Contempt Finding and Contempt Sanctions Orders, not for the first time in October.

87.     Third, the Debtor's New Argument is no more than a bare assertion of impossibility, which cannot suffice under the law for impossibility defenses. Generally, impossibility based solely on the contemnor's assertion does not suffice, *see Ali*, 874 F.3d at 833 ("A bare assertion of nonpossession cannot satisfy this burden."), nor can asserting impossibility generally or

---

ability to access, retrieve, or recreate them," having "no legal authority to" do so without copying copyright and exposing herself to liability, and (2) the Debtor's noncompliance with the Course Website Login Directive on the grounds that the "login credentials requested were controlled by a third-party platform," the Debtor "d[id] not have the passwords or administrative access," she "ha[d] attempted in good faith to recover or reset the passwords but was unsuccessful, and "[t]he platform's access is now outside my control").

conclusorily. *See South Carolina v. United States*, 907 F.3d 742, 764 (4th Cir. 2018). A successful impossibility defense generally requires that the contemnor proffers specific and detailed facts underpinning their assertion of impossibility, *see id.*, and can require the contemnor to proffer affirmative acts they took to achieve compliance not just as to some parts of order, but " 'all reasonable efforts to comply' " with the entire order. *See Ali*, 874 F.3d at 833. The Debtor proffers no details underpinning this new argument or explanations as to why she raises such argument so late in these contempt proceedings. The Debtor proffers nothing such as, for example, the following: (1) specific recorded attempts to obtain the Course Documents given they are linked to a class for which she paid and thus arguably is entitled to an extent, (2) clarifications how her new ground can be true and still comport with her previous submissions of facts that indicate at least in a vacuum that she possesses Course Documents,[294] or (3) explanations for why her previous defense of her noncompliance fixated on alleged issues as to the Course Documents Directives themselves warranting noncompliance if, according to the new ground, noncompliance would be inescapable even absent those issues.

88.     Fourth, an asserted impossibility defense cannot suffice when rebutted by the prior conduct of the contemnor, as is the case here. Generally, the contemnor's proffer of factual impossibility must "convince the court that compliance . . . [is] actually impossible (rather than merely difficult, inconvenient, or potentially impossible)." *See South Carolina*, 907 F.3d at 765. Similarly, courts may reject such a proffer even if it would otherwise suffice when it is discredited by the contemnor's prior conduct. *See Withrow v. Concannon*, 942 F.2d 1385, 1388 (9th Cir. 1991)

---

[294] A course barring enrollees' possession of the materials being taught seems to the Court to be at the least counterintuitive, if not odd and concerning, and especially so when the course involves remote aspects as the Jurist Course does.

("Impossibility of perfect compliance, then, may be a defense to contempt, but it does not preclude an injunction requiring compliance . . . when a pattern of non-compliance has been shown").

89.    The prior facts of this case rebut the Debtor's New Argument, not only because it is difficult to reconcile the new argument with how the Debtor defended her noncompliance prior to October, but also due to the Debtor's overall general pattern of noncompliance during these proceedings. This pattern is displayed by the Debtor's apparent selective recall of information queried at the Hearings,[295] as well as her general unwillingness to comply with really any of the Directives until particularly pressed as to a discrete part. The Debtor only complied once noncompliance became specific enough to patently constitute contempt and never before her noncompliance, while a fact, was not obvious. A contemnor's eventual and torturously obtained compliance with most directives, while indeed precluding further sanctions on the basis alone of those directives, should still be able rebut later self-serving submissions discordant with those prior facts.

90.    Fifth, the Court simply does not believe the Debtor's New Argument, based on (1) the Protective Motion and (2) the Debtor's noncompliance with the Forwarding Emails Directive. First, the Protective Motion, due to its timing and language, makes it virtually impossible, on the Court's view, that the Debtor is not in contact with the Tribal Entities.

91.    Second, the Court fashioned the Forwarding Emails Directive in a specifically narrowly tailored way so that the Debtor could show good faith efforts to comply. This is because, while doubtful, the Court does not completely rule out the possibility that the Debtor was enrolled in the Debtor's Jurist Course at some point but now no longer has access to any Course Documents and somehow has become cut off from all Tribal Entities. However, it is inconceivable how the

---

[295] *See generally supra* note 70.

Debtor can truthfully have no such emails to forward even if she was only minimally engaged with the Tribe as a rank-and-file paying member, which is one fact she has never repudiated. Thus, her specific noncompliance with the Forwarding Emails Directive confirms what is evinced by the facts before the Court: that as to the Tribal Directives, the Debtor can comply but chooses not to comply.

### ii.   Further Sanctions Coerciveness as to the Debtor's Compliance

92.   Deciding whether the Debtor has complied with the Contempt Orders, which she has not, does not end the analysis. This is because where sanctions under civil contempt have not coerced compliance, further sanctions may stop being coercive and become punitive to the extent a court believes it will either (1) not effectuate compliance, or (2) it can do so only do at a cost violative of due process.[296]

93.   After accruing more than $11,000 in Contempt Fines for almost half a year, the Debtor has not budged at all with regard to the Course Documents Directives and has only possibly budged with regard to one of the Tribal Directives, the First Mailing Directive. The Contempt Fines have not progressed the matters underpinning the Tribal Directives. Thus, continuing Contempt Fines now would be more punitive than coercive.

94.   For this reason, the Court will terminate the ongoing daily contempt fines in the Base Case and the Adversary Proceeding. However, the Court will neither (1) purge the contempt findings given that the Debtor has not complied with the Contempt Orders and is still in contempt nor (2) vacate the accrued fines.

---

[296] *See supra* ¶ 81.

95.     As to the second, the Court will not vacate the accrued fines, despite the fact some

courts do,[297] for two reasons. First, the Court questions whether such practice is advisable since it

seems to engender delay of compliance because it makes when compliance occurs not a concern

of a contemnor if they will eventually comply. Second, the Court's recognition that the Contempt

Fines have become punitive is only with regard to the Tribal Directives. Indeed, this does not

appear to have been the case with the non-Tribal Directives. The Contempt Fines were requisitely

coercive as to the non-Tribal Directives until the Debtor came into compliance, which was

sometime around the November 3 Hearing. For this reason, the Court terminates the fines as of

November 3, 2025.

### b. The Debtor's Outstanding Motions

96.     The Outstanding Motions all generally seek reconsideration of various Court orders

made during these proceedings, specifically six related to the Contempt Orders.[298] The Court will

first consider the Notice Reconsideration Motion which seeks reconsideration of the Order

Denying Shortened Notice.[299]

97.     The Notice Reconsideration Motion argues that her Shortened Notice Motions for

the Third and the Fourth Contempt Review Motions should have granted because (1) the matters

were urgent due to the Court's criminal contempt threat,[300] (2) the Debtor is *pro se* whereas the

---

[297] *See, e.g., Consolidated Rail Corporation, v. Wayne L. Yashinsky*, 170 F.3d 591, 596 (6th Cir. 1999). *But see, e.g., In re Grand Jury Proceedings (Caucus Distributors)*, 871 F.2d 156 (1st Cir. 1989) (acknowledging that new circumstances making what is being coerced impossible precluded fines from continuing to accrue, but "remand[ing] for computation of the aggregate fines" assessed prior to the change in circumstances); *In re Grand Jury Subpoena Duces Tecum (Arrington)*, 955 F.2d 670 (11th Cir. 1992) (holding that the purging of civil contempt findings due to the contemnor's eventual compliance did not affect the fines accrued prior to compliance which were stilled owed).

[298] *See infra* note 304.

[299] *See* Notice Reconsideration Motion, ¶ intro & ¶ V.20–24.

[300] *See* Notice Reconsideration Motion, ¶¶ I.2–5 & ¶ IV.16.

Trustee and Bankruptcy Administrator have a staff and resources warrants accommodation for her,[301] and (3) she had previously been able responded to a pleading in this case in a four day like she wanted here.[302]

98.     The Court denies the Notice Reconsideration Motion. The extremely short notice period sought by the Shortened Notice Motions for the Third and the Fourth Contempt Review Motions alone warrants the ruling and precludes reconsideration. It was further warranted since by the time the Debtor filed the Shortened Notice Motions, she had been well aware of this rule through her many attempts to avoid it.[303]

99.     The other six Outstanding Motions make various submissions, many of which duplicate arguments the Debtor has already raised and the Court has rejected. Together, they seek termination and reconsideration of the Contempt Sanctions, Findings, and Orders as it relates to the Course Documents Directives, emergency stay of the Orders, a protective order shielding the Course Documents from discovery, an award of attorney's fees, reconsideration of the discharge denial, and, finally, declarations that the Court cannot punish the Debtor, that the Debtor has complied or that her compliance is impossible, and that the Course Documents are copyrighted and irrelevant to bankruptcy.[304]

100.    Four motions seek this on the Debtor's ground (1) that she cannot comply with the Course Documents Directives because she does not own or possess the Course Documents, that (2) the Course Documents are copyrighted and irrelevant to bankruptcy, and[305] all six also assert

---

[301] *See* Notice Reconsideration Motion, ¶¶ II.6–8 & ¶ IV.17

[302] *See* Notice Reconsideration Motion, ¶¶ III.9–11.

[303] *See, e.g., supra* note 44 and accompanying text.

[304] *See* First Contempt Review Motion, ¶ 4; Second Contempt Review Motion, ¶¶ III.18–23; Third Contempt Review Motion, ¶¶ V.20.1–6; Fourth Contempt Review Motion, ¶¶ IV.r.1–5; Fifth Contempt Review Motion, ¶¶ IV.1–4; Sixth Contempt Review Motion, ¶¶ III.18–21.

[305] *See* First Contempt Review Motion, ¶¶ 1.J; Second Contempt Review Motion, ¶¶ II.A.7–C.15; Third Contempt Review Motion, ¶¶ IV.B.9–B.12 & IV.D.16–E.19; Fourth Contempt Review Motion ¶¶ III.1–4.

(3) that the Course Documents Directives violates the Debtor's constitutional right to due process because her compliance is impossible.[306] The Stay Motions also argue that the Contempt Orders violate (4) the Debtor's her right to privacy and (5) the Court's Article I authority.[307]

101.    As to the second two grounds, the Court has already rejected these arguments multiple times. As to the first ground, the Court does not believe the Debtor.[308] For the same reasons, the Court rejects the due process grounds. As to the privacy grounds, they are not timely and should have been raised earlier. Lastly, as to the Article I powers ground, the Court agrees with the Debtor completely that the Court does not have the power to seek punitive sanctions. This is exactly why, as the Court has explained multiple times to the Debtor, the Court has never considered itself executing or initiating any criminal penalties against or imprisonment of the Debtor. Thus, the Court denies all requested relief in the Outstanding Motions.[309]

## B.  **Criminal Matters**

### 1.  **Legal Background**

#### a.  Bankruptcy Courts' Powers to Refer for Criminal Prosecution, to Seek Criminal Contempt, and their Duty to Report Crimes under 18 U.S.C. § 3057

102.    Notwithstanding bankruptcy courts' substantial civil contempt powers, so long as its sanctions remain coercive or compensatory,[310] bankruptcy courts generally cannot execute, initiate, or formally seek criminal penalties. However, bankruptcy courts have a statutorily

---

[306] *See* Second Contempt Review Motion, ¶¶ II.C.13–C.14; 248, ¶¶ IV.B.9–C.15 & ¶¶ IV.E.18–E.19; Fourth Contempt Review Motion ¶ III.4; Fifth Contempt Review Motion, ¶ II.A.5; Sixth Contempt Review Motion, ¶ I.4.
[307] *See* Fifth Contempt Review Motion, ¶ II.A.5; Sixth Contempt Review Motion, ¶ I.4.
[308] *See supra* ¶ 90–91.
[309] With the exception, of course, of the Debtor's request to terminate the ongoing contempt fines, which the Court does order, but not because the Court grants the Debtor's request on the grounds she asserts, but because the Court does so *sua sponte* on other grounds.
[310] This power includes the power to imprison.

imposed duty when they "hav[e] reasonable grounds for believing that any violation under chapter

9 of this title or other laws of the United States relating to insolvent debtors … has been committed,

or that an investigation should be had," to "report to the appropriate United States attorney all the

facts and circumstances of the case, the names of the witnesses and the offense or offenses believed

to have been committed." 18 U.S.C. § 3057. This language is neither permissive nor discretionary;

it is a mandatory duty of this Court from Congress.

b. <u>Unauthorized Practice of Law Elements in North Carolina and Bankruptcy Courts
Procedure for Reporting it under 18 U.S.C § 3057</u>

103.    North Carolina law bars the practice of law by any non-licensed individual, see

N.C. Gen. Stat. § 84-2.1, and criminalizes the unauthorized practice of law as a Class 1

misdemeanor. See N.C. Gen. Stat. § 84-8. North Carolina defines the "practice of law" broadly to

reach "performing any legal service for someone else," and "include[es]. . . preparing or aiding in

the preparation of any petitions,. . . assisting by advice, counsel, or otherwise in any legal work;

and advis[ing] or giv[ing] opinion upon the legal rights of" someone else. N.C. Gen. Stat. § 84-

2.1. Section 84-7 empowers district attorneys to seek injunctions or criminal prosecution for

violations of § 84-2.1. North Carolina bankruptcy courts that believe the unauthorized practice of

law has occurred have a duty to report it to both the U.S. Attorney and the state district attorney

pertinent to its district due to the mixed federal and state jurisdiction of such potential crimes in

the bankruptcy context. *See, e.g., In re Howerton*, No. 04-12819, 2004 Bankr. LEXIS 2695, at *2

(Bankr. M.D.N.C. Nov. 24, 2004).

c. <u>Criminal Perjury Elements and Perjury's Effect as to Discharge in the Fourth Circuit</u>

104.    Making a false oath or false declaration in front of a federal court is a crime

punishable by fines and up to five years imprisonment. *See* 18 U.S.C. § 1621 (criminalizing perjury

before a federal court generally); 18 U.S.C. § 152(2)–(3) (criminalizing perjury specifically in a bankruptcy case). Courts interpreting the latter have held such a crime has occurred when the following elements are met: (1) the existence of a bankruptcy proceeding, (2) a statement made therein that is (a) material and (b) false, and (3) the statement was made (a) under oath and (b) knowingly and fraudulently. *See, e.g., Metheany v. United States*, 390 F.2d 559, 561 (9th Cir.), cert. denied, 393 U.S. 824 (1968).

### d.   Criminal Contempt Elements and an Impossibility Defense

105.   Contempt is criminally punishable conduct pursuant to 18 U.S.C. § 401(3) empowering courts "to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as. . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." The Fourth Circuit interpreting 18 U.S.C. § 401(3) has held it requires three elements that approximately mirror those for civil contempt, specifically, " '(1) a reasonably specific order; (2) violation of the order; and (3) the willful intent to violate the order'." *United States v. Mahbobeh Shariati*, 694 F. App'x 893, 894-95 (4th Cir. 2017) (citation omitted) (per curiam)). The Fourth Circuit has also held that criminal contempt under 18 U.S.C. § 401(3), unlike civil contempt, requires that the contemnor "willfully violated a decree that was clear and left no uncertainty in the minds of those that heard it." *United States v. Westbrooks*, 780 F.3d 593, 595 (4th Cir. 2015) (internal quotation marks omitted).

2. **Analysis**

    a.  <u>The Criminal Allegations against the Tribal Entities</u>

    106.   Sufficient evidence exists for a reasonable belief that the Tribe has or is committing unauthorized practice of law. This conclusion is evinced through pieces of evidence displaying the Tribe's activities generally as well as various actions taken by the Debtor in this case.

    i.   Evidence that the Tribal Entities Have Committed Unauthorized Practice of Law Independent of this Case[311, 312]

107.    Shabazz Associates offers a 'Tribal Jurist Course Certification' through Aboriginal University taught by Minister Shabazz.[313] Individuals can obtain this 'Certification' upon enrollment in and completion of one of four proffered 'semesters' for the course.[314] This course

---

[311] The Court notes that the Bankruptcy Administrator uncovered this information through her own independent research. The Court notes this, first, to acknowledge the Bankruptcy Administrator's hard and diligent work as to these matters. The Court also notes this because, although the Bankruptcy Administrator presented this evidence at the October Hearing, she was unable admit most of it through the Debtor's testimony. *See Exhibit List* [Doc. No. 232]. Nevertheless, the Court does not think covering the evidence here contravenes evidence rules preventing admittance there and are binding on the Court, for two reasons.

    The first reason is that this evidence's availability online suggests it qualifies for judicial notice as the Fourth Circuit has recognized for at least some websites. *See, e.g., Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004); *United States v. Garcia*, 855 F.3d 615, 621–22 (4th Cir. 2017). Additionally, it being available specifically on Internet Archive further bolsters that judicial notice of the evidence is allowed. *See Under a Foot Plant Co. v. Exterior Design, Inc.*, No. 6:14-cv-01371-AA, 2015 U.S. Dist. LEXIS 37596, 2015 WL 1401697, at *4 (D. Md. Mar. 25, 2015) ("District courts have routinely taken judicial notice of content from The Internet Archive."); *Pinder v. 4716 Inc.*, 494 F. Supp. 3d 618, 625 (D. Ariz. 2020) ("Archived websites may sometimes be afforded judicial notice.").

    Second, courts considering reporting under 18 U.S.C. § 3057 have recognized doing so does not necessitate following all evidence rules since a court finding it must report a crime under 18 U.S.C. § 3057 is not the same as a court finding that the crime did indeed occur. *See Frankoff v. Norman*, No. 14-11-00152-CV, 2012 Tex. App. LEXIS 5045, at *12–15 (Tex. App. June 26, 2012) ("The Referral does not constitute conclusive proof. . . . [A] referral [18 U.S.C. § 3057] is not evidence of a crime, but is based on the referree's conclusion that there are grounds supporting a reasonable belief that a crime was committed. *Id.* § 3057(a). As such, it may be based on information that is not admissible evidence to be investigated by the United States Attorney. *See In re Coral Petroleum, Inc.*, 249 B.R. 721, 725 (Bankr. S.D. Tex. 2000) (noting referral to United States Attorney was for investigation of potential criminal conduct). It is not proof of the allegations contained within it. *See id.*; *see also In re Guttierez*, 248 B.R. 287, 290 n.3 (Bankr. W.D. Tex. 2000) (noting bankruptcy court may not adjudicate criminal matters relating to concealment of assets belonging to bankruptcy estate but may refer matter for criminal investigation)."); *United States v. Hubbard*, 650 F.2d 293, 323 (D.C. Cir. 1980) (stating that "[o]f course, copies of the documents can be made available by the court to appropriate law enforcement authorities," regardless "as to what is admissible evidence and what is not" (citations omitted)).

[312] The Court reproduces all language from sources in this section as they appear (and without any "sic" notations), except for omissions, punctuation additions, and stem and some capitalization changes.

[313] *Tribal Jurist Course*, SHABAZZ ASSOCIATES, https://shabazzassociates.com/tribal-jurist-course (last visited Dec. 10, 2025) (permalink: https://web.archive.org/web/20250806084125/https://shabazzassociates.com/tribal-jurist-course).

[314] *Registration For Tribal Jurist Course – AU & Shabazz Associates*, GOOGLE FORMS, https://docs.google.com/forms/d/1taRQ7TGa3IT17dG4Ac1S6IU_IYUFoz6nYsHS-OjtUYI/viewform (last visited Dec. 10, 2025). (permalink: https://web.archive.org/web/20251210164341/https://docs.google.com/forms/d/1taRQ7TGa3IT17dG4Ac1S6IU_IYUFoz6nYsHS-OjtUYI/viewform?edit_requested=true).

costs $1,000.[315] Shabazz describes the course's "[p]urpose" as "to Certify Aboriginal Jurists who can become law professionals in our Indigenous Jurisdiction and protect Indigenous Nationals of ARNA who are also US Nationals from adverse actions from adverse legal fictions posing as governmental structure."[316] The topics covered in the course include:

- "Taxes, Debt and Currency," which purports to teach enrollees "how to live a tax Exempt for Life Operation (all Sales Taxes) via Indigenous Exemption, Ecclesiastical Automatic Exemption, or Itemized Deduction on 1040, How to properly engage form 56, How to Fillout Form i-9 as a Native, How to Use forms w-8 Ben W-9 and W-4 properly, How to engage Property Tax Exemption using Ecclesiastical entities and or Itemized deductions on 1040's," as well as "Understanding debt and what it actually is and what it is used for and the impacted;"
- "Lawsuits and Keys to Winning," which purports to teach enrollees "to be comfortable going to court and working with nationals and non-nationals on cases and the property way of dealing with issues and winning in court;"
- "Contract Law," which purports to teach enrollees how "to understand how contracts work and the impact of them on Aboriginal people" and "[h]ow to properly engage in contract without jeopardizing the status of the aboriginal;" and
- "Business Operations as Tribal Jurist and Running Tribal Law Firm Successfully," which purports to teach enrollees how "to put[ ] it all together. . . to understand how to organize yourself and run your law firm to serve aboriginals."[317]

HAWAB ARNA describes this course as enabling enrollees to:

- "Assist with Tax Matters, dealing with fraudulent claims by ALL Tax Entities making unlawful claims on Indigenous Peoples, Removing PERMANENTLY Fraudulent Child Support Claims;"[318]
- "Removing Fraudulent Mortgage Issues and Fraudulent Debt Claims from the most successful system of removing erroneous debt claims, the identity theft Identity Fraud Procedure;"[319]

---

[315] *Tribal Jurist Course – Shabazz Associates & AU – Winter Semester – This Is Self Paced Semester-Donation*, SHABAZZ ASSOCIATES, https://shabazzassociates.com/shop/ols/products/tribal-jurist-course-shabazz-associates-and-au-winter-semester (last visited Dec. 10, 2025) (permalink: https://web.archive.org/web/20251217071307/https://shabazzassociates.com/shop/ols/products/tribal-jurist-course-shabazz-associates-and-au-winter-semester).
[316] *Id.*
[317] *Id.*
[318] *Front Page*, HAWAB DFW, ABORIGINAL REPUBLIC OF NORTH AMERICA, https://www.hawabdfw.org (last visited Dec. 10, 2025) (permalink: https://web.archive.org/web/20250714022258/https://www.hawabdfw.org/).
[319] *Id.*

- Assist with Lawsuit issues . . . : all types in Indigenous Jurisdiction and foreign venues. The multiple levels of labor offered guarantee the Aboriginal Jurist will have a service that is high demand." [320]

108.    Shabazz Associate's website also contains a webpage titled "Debt, Tax, Student, OTHER DEBT Discharge Intake." Although the Google Form for this is no longer accepting responses,[321] this webpage also provides links to purchase from Shabazz 'Debt Donation Removal' for $1,500[322] and '7 Year Statute Of Limitations Donation' for $500 which is marketed with a picture stating "Debt Relief Just Ahead."[323]

109.    Aboriginal University, which claims to be ARNA's first accredited educational institute and the certifying arm for all Aboriginal Jurists,[324] offers, through its 'School of Law', courses on topics such as "Tribal Business Registration," "Business & Personal Credit," "Law Consultation," "Lawsuit Drafting," "Business Credit and Personal Credit Services," and "Land Trust Services."[325] Level 2 of the Jurist program features 'homework' that quizzes enrollees on topics such as "Insolvency," "liability," being a "debtor," "Creditor[s]," "liquidation,"

---

[320] *Id.*

[321]    *Debt, Tax, Student, OTHER DEBT Discharge Intake*, SHABAZZ ASSOCIATES, https://shabazzassociates.com/debt-discharge-intake (last visited Dec. 10, 2025) (permalink: https://web.archive.org/web/20251217070408/https://docs.google.com/forms/d/e/1FAIpQLScg64bVbL8o ybGfbb486qumWdtB2RpRkpRmjlYFsCv6JhUUEQ/closedform).

[322]    *Debt Donation Removal*, SHABAZZ ASSOCIATES, https://shabazzassociates.com/shop/ols/products/bankruptcy (last visited Dec. 10, 2025) (permalink: https://web.archive.org/web/20251217071038/https://shabazzassociates.com/shop/ols/products/bankruptc y).

[323]    *7 Year Statute of Limitations Donation*, SHABAZZ ASSOCIATES, https://shabazzassociates.com/shop/ols/products/7-year-statute-of-limitations (last visited Dec. 10, 2025) (permalink: https://web.archive.org/web/20251217071116/https://shabazzassociates.com/shop/ols/products/7-year-statute-of-limitations).

[324] *Front Page*, ABORIGINAL UNIVERSITY, https://www.aboriginaluniversity.com/ (last visited Dec. 17, 2025) (permalink: https://web.archive.org/web/20250222102643/https://www.aboriginaluniversity.com/).

[325]    *School of Law–Aboriginal Jurists*, ABORIGINAL UNIVERSITY, https://www.aboriginaluniversity.com/school-of-law-aboriginal-jurists.html (last visited Dec. 17, 2025) (permalink: https://web.archive.org/web/20250513195328/https://www.aboriginaluniversity.com/school-of-law-aboriginal-jurists.html).

"competency," the Supremacy Clause, "real defense," "fraud," "Bankruptcy," the Bankruptcy

Clause, the UCC, differences between "chapter 13 & Chapter 7 discharge," "arrears," a "habeas

corpus action," Chapter 7's effect on child support, and remedies for child support orders.[326] Level

3 of the program offers training on "International Law–Patent Trademark Copyright Training."[327]

110.   HAWAB ARNA also offers 'Jurist Level 1 Private Coaching," which also costs

$1,000.[328] HAWAB ARNA describes this coaching as "Minister Kojo you will have access to us

on a weekly conference call which will be recorded" and requires that "you must be enrolled as a

jurist at one of the following institutions: ARNA Aboriginal Law Firm/Aboriginal University[,]

Hawab University[,] Or Any Other Creditable University within ARNA."[329]

    ii.   Evidence that the Tribal Entities Have Committed Unauthorized Practice of Law
        from this Case

111.   The Debtor actions both prior to the Petition Date and within this case appear to

have been done at the advice of, for the benefit of, or in concert with the Tribal Entities. First, as

to actions done prior to the Petition Date, the Debtor was a member of the Tribe as of the Holt

Solutions Creation Date and Conveyances Date based on both independent evidence[330] and the

---

[326] *Jurist Homework 2*, ABORIGINAL UNIVERSITY, https://www.aboriginaluniversity.com/jurist-homework-2.html (last visited Dec. 17, 2025) (permalink: https://web.archive.org/web/20250513190135/https://www.aboriginaluniversity.com/jurist-homework-2.html).

[327] *About US*, ABORIGINAL UNIVERSITY, https://www.aboriginaluniversity.com/about-us.html (last visited Dec. 17, 2025) (permalink: https://web.archive.org/web/20250513200711/https://www.aboriginaluniversity.com/about-us.html).

[328] *Hawab Jurist Level 1 Private Coaching*, HAWAB ARNA, ABORIGINAL REPUBLIC OF NORTH AMERICA, https://www.hawabdfw.org/product/hawab-jurist-level-1-private-coaching/ (last visited Dec. 10, 2025) (permalink: https://web.archive.org/web/20250208052222/https://www.hawabdfw.org/product/hawab-jurist-level-1-private-coaching/).

[329] See Id.

[330] *See Arna Annual Budget for 2023*, ARNA, https://www.arnagovernment.org/uploads/3/7/6/0/37603483/arnaannualbudget2023.pdf, p. 8 (last visited Dec. 16 2025) (permalink: https://web.archive.org/web/20240330042259/https://www.arnagovernment.org/uploads/3/7/6/0/3760348

Debtor's own testimony.[331] The Debtor has also averred multiple times in this case and as late as October, 2025, to having taken a Jurist Course.[332] Lastly, the Debtor paid a total $3,930 to Tribal Entities within three years of the Petition Date—almost $2,000 in 2022, the year of the Holt Solutions Creation Date, nearly $1,200 in 2023, the year of the Conveyances Date, and almost $900 in 2024, the year of the Petition Date.[333] These facts reasonably suggest the Tribe's advancement or involvement in the creation of Holt Solutions and the Conveyances. Indeed, the fact alone that the Debtor has paid so much to the Tribe the last few years for apparently nothing in return, is suspect.

112.    Moreover, further evidence ties the Tribal Entities to the creation of Holt Solutions and the Conveyances. Prior to Petition Date, the Debtor described the creation of Holt Solutions as relating to the Tribal Entities.[334] The Debtor has similarly described the creation of Holt Solutions and the Conveyances as relating to the Tribe throughout her various submissions during these proceedings.[335] The clear implication of these facts is that the Tribe directed or advised the Debtor for both the creation Holt Solutions and the Conveyances, which is all the more concerning given the deleterious effect of both on the Debtor's financial matters, the Payments she's made to the Tribe, and the lack of any value in return. This above evidence is further corroborated by (1)

---

3/arnaannualbudget2023.pdf) (listing the Debtor, but misspelled as "Ryan Lashaun Ford," amongst members it appears that were in good standing as to paying dues).

[331] *See, e.g., supra* note 66 and accompanying text.

[332] *See supra* note 180

[333] *See supra* note 190 and accompanying text.

[334] *See supra* note 5 and accompanying text.

[335] *See, e.g.,* First Tribal Property Motion, ¶ 1 ("The Debtor is an enrolled member of the Xi-Amaru Tribal Government (ARNA) (Aboriginal Republic of North America), a distinct tribal government. Before filing bankruptcy, the Debtor transferred title to certain real property to a Tribal LLC operating under tribal customs and authority affiliated with the Xi-Amaru (Aboriginal Republic of North America)."); Second Tribal Property Motion, ¶ 1 (identical language); First Protective Motion, ¶ 2 ("Debtor is an enrolled tribal member of the Xi-Amaru Tribal Government, and representative of Holt Solutions, LLC operates under tribal jurisdiction, pursuant to tribal law and protocol.").

how the Tribal Entities offer the very courses that comprise the Debtor's Tribal Courses,[336] (2) how the Debtor has continued to assert the Tribal Entities' copyright justifications as why she cannot comply with some of the directives, (3) how the Debtor has displayed confusion as to the content of her own pleadings, and (4) how the Protective Motion displays that the Debtor's actions in this case have been at the Tribal Entities' direction.

************************

113.    The Court believes the evidence above reasonably evinces unauthorized practice of law which the Court is under a duty to report. While the evidence from the Tribe that is independent of this case may be protected by the First Amendment (but, if so, only under the relaxed standard for commercial speech), when combined with the evidence from this case, there is the appearance that the Tribe is attempting to obtain legal outcomes in the Western District of North Carolina Bankruptcy Court through the Debtor's case without needing to be admitted to the Court. Thus, the Court reports this to the U.S. Attorney for Western District of North Carolina and the Mecklenburg County District Attorney.

114.    The Court believes these activities warrant investigation particularly because, to the extent individuals are paying the inordinate costs for the Tribe's 'services', it would be a scam targeting some of the most vulnerable individuals. While the Court's jurisdiction limits it to dealing with the Debtor and is unable to investigate the Tribe as a non-party (e.g., through issuances of show cause orders), prosecutors are not so constrained.

---

[336] *See supra* ¶¶ 107–110 (canvassing the Tribal Entities offering 'Jurist Courses'); *see also* Holt Solutions Document Production Motion (canvassing how the Tribal Entities offer cosmology and genealogy courses).

b. <u>The Criminal Allegations against the Debtor</u>

    i. The Criminal Contempt Allegations against the Debtor

115. The Debtor appears to have willfully not complied with the Contempt Orders as they pertain to the Tribal Entities.[337] Thus, pursuant to its duty under 18 U.S.C. § 3057, the Court reports this crime of criminal contempt to the Western District of North Carolina U.S. Attorney.

    ii. The Perjury Allegations against the Debtor

116. It appears that the Debtor has made numerous false submissions both to this Court, the Trustee, and the District Court, since the Petition Date. According to the Court's review, the Debtor has made false submissions as to:

- (1) the Properties' valuations by approximately 90%: once, affirmatively in the Debtor's Petition;[338]
- (2) the Debtor's Creditors: once, by omission in the Debtor's Petition;[339]
- (3) the Debtor's interest in Holt Solution, two times: first, (a) by omission in the Debtor's Petition,[340] then (b) affirmatively at the January 341 Meeting;[341]
- (4) the Conveyances, two times: affirmatively both (a) in the Debtor's Petition[342] and (b) at the January 341 Meeting;[343]
- (5) the Rental Income eleven times: by omission and affirmatively twice both (a)–(c) in the Debtor's Petition[344] and (d)–(i) in the Amended Schedules,[345] by omission (j) in the Reaffirmation Agreement,[346] and (k) by omission in the IFP Application;[347]
- (6) the Debtor's Accounts, countless times: in the Debtor's Petition, in various pleadings, and in testimony before the Court;

---

[337] *See supra* ¶¶ 83–91.

[338] *Compare* Debtor's Petition, p. 11 (the Debtor's valuations of $30,000 for both Properties) *with* Seventh Report, Ex. C, p. 26 & 29 (providing the Mecklenburg County Office of the Tax Collector's 2025 assessed valuation of $378,600 for the Yorkford Property and $272,900 for the Nevin Property).

[339] *See supra* ¶¶ 7–9.

[340] *See id.*

[341] *See supra* ¶ 10.

[342] *See supra* ¶¶ 7–9.

[343] *See supra* ¶ 10.

[344] *See supra* ¶¶ 7–9.

[345] *See supra* ¶¶ 21 & 24.

[346] *See supra* ¶ 11.

[347] *See supra* ¶¶ 7–9.

- (7) the Tribal Payments, twice: (a) at the January 341 Meeting[348] and (b) the May Hearing;[349] and
- (8) the Trustee and the Bankruptcy Administrator's actions, affirmatively twice: in the Original Recusal Motion and the Original Reference Withdrawal Motion Response Reply.[350]

117.    Although there is only direct evidence as to its willfulness as to one of the above false submissions,[351] the number of false submissions and their convenience to the Debtor's position on the matters for which the Debtor proffered them, sufficiently evinces a strong case of criminal perjury. Similarly, as to the Debtor's false submissions regarding the Debtor's Accounts, the Debtor's pattern of compelled, piecemeal disclosure aggravates those false submissions and demonstrates that those omissions were not inadvertent but willful.

118.    The Debtor made all of the above submissions including the Debtor's Petition, the Debtor's Amended Schedules, and the IFP Petition under penalty of perjury.[352] In the Debtor's Petition, the Debtor also acknowledged being "aware that bankruptcy fraud is a serious crime and that if [her] bankruptcy forms are inaccurate or incomplete, [she] could be fined or imprisoned."[353] At the January 341 Meeting, the Debtor's statements were made under oath,[354] as were generally all the Debtor's statements in her pleadings and at the various hearings before the Court.

---

[348] *See supra* ¶ 10.

[349] *See supra* ¶ 18

[350] *See supra* ¶ 33.

[351] *See* May Hearing Transcript, at 6:12–6:14 (the Debtor acknowledging that the second false submission above, her omission of the creditors of her assets, was an intentional omission for at least the mortgage company).

[352] *See* Debtor's Petition, p. 6 (the Debtor's signature below a declaration that the information provided was "true and correct" as to her Petition generally "under penalty of perjury"); *id.*, p. 47 (same as to her Schedules generally); *id.*, p. 59 (same as to her Statement of Financial Affair); *id.*, p. 64 (same as to her Chapter 7 Statement of [Her] Current Monthly Income) & Second Amended Schedules, p. 5 (same); Filing IFP Application, p. 3 (same as to her Filing IFP Application).

[353] Debtor's Petition, p. 8.

[354] January 341 Meeting Transcript, at 3:10–3:13 (the Debtor taking the oath).

119.    In sum, the Court believes that the facts above reasonably show that the Debtor has engaged in perjury. Thus, pursuant to its duty under 18 U.S.C. § 3057, the Court reports these crimes to the Western District of North Carolina U.S. Attorney.

**************************

120.    However, the Court would not recommend any criminal prosecution against the Debtor for these crimes of criminal contempt and perjury. The reason for this is that the Court feels that the financial costs to the Debtor from this case sufficiently punishes the Debtor.

121.    These costs are not due to the civil contempt sanctions, which themselves are not insignificant, but rather the reasonable administrative costs of the Trustee so far in this case. Only considering the Trustee's expenses and fees incurred December through May of 2025, the administrative costs exceed of $43,000[355] and will most likely be at least double that by the end of these proceedings. Pursuant to 11 U.S.C. § 507, these expenses are given priority from distribution of the Debtor's assets. This case is uniquely an asset case and proceeds from the Debtor's assets will have to be liquidated, and the proceeds will go to covering these expenses and to pay the Debtor's creditors. The Court believes that this natural result of the Debtor's actions is punishment enough as an incurrence of expenses at this level is not an insignificant penalty.

## C.  The Trustee's and Bankruptcy Administrator's Requests

122.    Lastly, the Trustee and Bankruptcy Administrator have requested other relief beyond that discussed. First, the Trustee asks the Court to issue "a final denial of the Debtor's discharge in this case."[356] Second, the Bankruptcy Administrator seeks imposition of Federal Rule

---

[355] *See First Fee Application & Order Awarding Compensation to Attorney Hamilton Stephens Steele + Martin, PLLC, Trustee's Attorney* [Doc. No. 306].
[356] Seventh Status Report, p. 14.

of Bankruptcy Procedure 9011 sanctions due to the Debtor's filing of pleadings making frivolous or previously rejected arguments.[357] Third, the Bankruptcy Administrator requests a prefiling injunction barring the Debtor from filing pleadings based on (1) the dozens of pleadings filed by the Debtor lacking any basis in law or fact or misrepresenting both, (2) the Debtor continually seeking relief already denied and reasserting arguments previously rejected, (3) the Attempted Representation, as well as (4) various duplicative filings.[358]

### 1. The Trustee's Request for Final Denial of Discharge

123.    The Court grants the Trustee's final denial of the Debtor's discharge. First, the Court's previous denial conditioned any possible discharge on the Debtor fully complying with the Contempt Orders, which, because the Court has found that the Debtor can comply but choose not to,[359] interdicts any possible discharge. Additionally, although the Court is not recommending further prosecution of the Debtor for perjury, it does not doubt it has occurred to a criminally sanctionable extent which necessarily means the Debtor is ineligible for discharge under 11 USCS § 727(a)(4)(A) and Fourth Circuit precedent. *See, e.g., United States v. Sieber (In re Sieber)*, 489 B.R. 531, 554 (Bankr. D. Md. 2013) (setting the standard for 11 USCS § 727(a)(4)(A)'s bar of discharge due to a debtor having "made a false oath or account," as requiring that the debtor made a statement that was (1) false, (2) material to the bankruptcy case, and (3) it was done (a) under oath, (b) knowing its falseness, and (c) with fraudulent intent (citations omitted)); *see also Van Robinson v. Worley*, 849 F.3d 577, 583 (4th Cir. 2017) (citation omitted).

---

[357] *Limited Response Pursuant to Bankruptcy Rule 9011 to Debtor's Filing at ECF No. 290* [Doc. No. 298]; *Limited Response Pursuant to Bankruptcy Rule 9011 to Debtor's Filing at ECF No. 292* [Doc. No. 299].
[358] *See id.*
[359] *See supra* ¶¶ 83–91.

## 2.  The Bankruptcy Administrator's Request for Federal Rule of Bankruptcy Procedure 9011 Sanctions

124.    As to the Bankruptcy Administrator's request for Rule 9011 sanctions, the Court denies it. First, the Court does not dispute Bankruptcy Administrator's assertion that the Debtor has persistently and flagrantly violated Federal Rule of Bankruptcy Procedure 9011 through her litany of pleadings and continual reassertion of meritless arguments long after the Court has explicitly rejected them. One need look no further than six Outstanding Motions canvassed above to see this.

125.    Nevertheless, the Court feels itself is sufficiently to blame on this score to make Rule 9011 sanctions unwarranted as of now. The Court should have made clear to the Debtor much earlier that she could not continue to make such arguments in her filings and in court, and that doing so would justify sanctions. It did not. The Debtor, as a *pro se* litigant (notwithstanding the Tribe's ostensible help), should have been informed of this consequence and its contours sufficiently prior to any imposition of such sanctions. Since the Debtor was not so informed, the Court is unwilling at this juncture to sanction the Debtor pursuant to Rule 9011.

## 3.  The Bankruptcy Administrator's Request for a Prefiling Injunctions

126.    As to the Bankruptcy Administrator's request for a filing bar on the Debtor, the Court grants it. The Debtor's continued reassertion of arguments the Court has rejected as well as the Debtor's multiple duplicate filings warrant such relief. Thus, any future filings by the Debtor must be first sent to the Court before they are docketed. The Court will approve appropriate filings as not reraising arguments the Court has rejected before allowing them to be docketed.

### III.    CONCLUSION

The Court concludes with the following three notes to the Parties. First, to all the Parties, the Court reiterates what it stated at first at November 3 Hearing, in the Final Contempt Order, and the November 17 Hearing, that this order finally disposes of all the contempt matters such as those relating to the Tribe and Tribal Entities, the Debtor's contempt and perjury, any alleged bias against the Debtor, etc. The Court sees absolutely no reason why it will need to hear these matters again, especially since it has heard them repeatedly over the last seven months. To the extent any Parties take any issue with this order, they can appeal it. Second, as to the Trustee and the Bankruptcy Administrator, the Court commends the work they have done throughout this case. They have had to spend an inordinate amount of time on this case, far more than is usual for a Chapter 7 case and probably more than most cases under any chapter of the Bankruptcy Code. Nevertheless, they have never failed to do what was required to find the information vital to the case which the Debtor would not or had not disclosed. This is particularly noteworthy for Bankruptcy Administrator who, unlike the Trustee, is not paid hourly, and yet still has worked on this case outside of work hours and even on the weekends. The bankruptcy system's very existence depends on individuals like the Trustee and the Bankruptcy Administrator verifying parties' submissions and litigating for the good of the system overall. They are the frontline defense against the conduct that has occurred here and the Court cannot stress enough their importance. Third, to the Debtor the Court states again, for clarity's sake, that the Court itself is not imposing any criminal penalties on the Debtor.

**WHEREFORE IT IS ORDERED** that

1. The Debtor's ongoing Civil Contempt Sanctions in the Chapter 7 Base Case and the Adversary Proceeding are TERMINATED as of November 3, 2025, and the accrued sanctions of $11,200 are REDUCED to a Money Judgement;

2. The Debtor is ORDERED to pay this Money Judgement to the Court by May 30, 2026;

3. The Court will SEND this Order by both certified mail and electronic email to the U.S. Attorney for the Western District of North Carolina and the Mecklenburg County District Attorney as a formal report pursuant to 18 U.S.C. § 3057 of possible crimes;

4. The Debtor's Outstanding Motions are DENIED;

5. The Debtor's DISCHARGE is DENIED;

6. The Debtor is BARRED from filing anything in the Chapter 7 Base Case that is automatically docketed and any future such filings must first be forwarded by the Bankruptcy Court Clerk to the Court before being docketed and the Court will review such filings to decide that they are not duplicitous or completely without merit; and

7. The Bankruptcy Administrator's Request for Federal Rule of Bankruptcy Procedure 9011 Sanctions is DENIED without prejudice.

**IT IS SO ORDERED.**

**This Order has been signed electronically.**
**The Judge's signature and Court's seal**
**appear at the top of this order.**

**United States Bankruptcy Court**